UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| PROJECT VOTE, AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, PEOPLE FOR THE AMERICAN WAY FOUNDATION, COMMON CAUSE, COMMUNITY OF FAITH ASSEMBLIES CHURCH, MARY KEITH, JOHN R. T. MAY, and LINDA SCAMMICCA,<br><br>        Plaintiffs,<br><br>    v.<br><br>J. KENNETH BLACKWELL, individually and in his official capacity as Secretary of State, JIM PETRO, individually and in his official capacity as Attorney General, WILLIAM D. MASON, as Prosecuting Attorney for **Cuyahoga** County, Ohio, and SHERRI BEVAN WALSH, as Prosecuting Attorney for **Summit** County, Ohio,<br><br>        Defendants. | CIVIL ACTION NO. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

Plaintiffs bring this Complaint for declaratory and injunctive relief challenging portions

of recently enacted provisions of Ohio law regulating voter registration efforts, Ohio Rev. Code

§§ 3503.14, 3503.19, 3503.28, 3503.29, and 3599.11, as well as the Secretary of State's

interpretation of those provisions. These onerous and vague new laws and regulations chill core political speech and association and have forced all of the plaintiffs to seriously curtail or halt their voter registration and related core political speech and association activities. The challenged laws and interpretations impose a variety of unreasonable restrictions on individuals and groups involved in voter registration activity, on pain of criminal penalties, including failing to clearly instruct how voter registration forms must be returned; imposing vague requirements that may subject individuals to criminal sanctions for associating and cooperating with others in organized voter registration drives; impeding individuals from registering to vote by means permitted by federal law; requiring each voter registration worker to complete an online training and register with the Secretary of State before they may distribute voter registration forms; requiring certain individuals to disclose for whom they work when distributing voter registration applications and requiring that information be disclosed on the voter registration application; and mandating the use of a voter registration form that is not in compliance with the law. This Court should declare that these new provisions, as written and as interpreted and enforced by Defendants, violate the First and Fourteenth Amendments to the United States Constitution, Section 2 of the Voting Rights Act, and the National Voter Registration Act of 1993, and enjoin their enforcement.

## PARTIES

**Plaintiffs**

1.      Plaintiffs are not-for-profit organizations, individual members of those organizations who are engaged in the political process and want to engage other people by registering them to vote, employees and individuals who wish to be employees of plaintiff organizations, and individual

Ohio citizens who will not be registered to vote absent the efforts of Plaintiffs and other groups and individuals affected by the new laws.

*Project Vote*

2.  Plaintiff Project Vote is a nonpartisan, non-profit organization incorporated in Louisiana and recognized as tax-exempt under section 501(c)(3) of the Internal Revenue Code by the Internal Revenue Service.  Its principal office in Ohio is located at 3615 Superior Avenue, 4th floor, Cleveland, Ohio 44114.

3.  Since its founding in 1982, Project Vote has assisted in registering and helped turned out to vote millions of low-income and minority citizens nationwide, trained hundreds of low-income and minority organizers, and provided registrants with nonpartisan, follow-up voter education.  It has assisted citizens in Ohio to register to vote since 1982, either directly or in collaboration with other Ohio-based community groups.

4.  Project Vote also provides professional training, management, evaluation, and technical services for voter engagement and voter participation activities in low- and moderate-income communities, including in Ohio.  In particular, Project Vote has provided funding and technical assistance to ACORN for substantial voter registration drives in ACORN communities throughout the country, including in Ohio.  Project Vote believes that creating and sustaining increased levels of voter participation by low- and moderate-income, minority, and other disenfranchised communities requires a strategic and comprehensive approach.  Project Vote has a full-time staff person working in Ohio monitoring and providing technical assistance to ACORN's voter registration drive and overseeing an election administration program designed to ensure that all eligible voters who submit applications to an election office are added to the state's list of eligible voters and are able to vote a regular ballot in the upcoming election.

5. When the challenged regulations went into effect, Project Vote was in the midst of conducting and assisting others to conduct voter registration drives in five cities in Ohio, including Akron, Dayton, Cincinnati, Columbus and Cleveland. As a result of the new law and the Secretary of State's actions, Project Vote has been forced to drastically cut back on its voter registration activities in Ohio and to divert substantial resources from its speech and association activities to comply with the new, onerous restrictions.

*ACORN*

6. Plaintiff Association of Community Organizations for Reform Now (ACORN) is a non-profit organization incorporated in Louisiana, with offices in Akron, Cincinnati, Cleveland, Columbus, Dayton, and Toledo, Ohio. The head office in Ohio is located at 3615 Superior Avenue, Cleveland, OH 44114.

7. ACORN is the nation's largest community organization of low- and moderate-income families, working together for social justice and stronger communities. Since 1970, ACORN has grown to more than 175,000 member families, organized in 850 member chapters in 75 cities across the United States and other countries. ACORN has six chapters in Ohio. ACORN members participate in local meetings, actively work on public policy campaigns, and elect their own leaders from their neighborhoods.

8. ACORN organizes voter registration drives, with the assistance of Project Vote, targeting low- and moderate-income families, including in Ohio. Voter registration is an important part of ACORN's mission to empower its members and the low- and moderate-income citizens in their communities. ACORN also conducts voter registration drives as part of its efforts to promote ballot initiative petitions on issues that are important to ACORN, its members, and their

communities.  They also encourage potential voters to support policies and initiatives supported by ACORN.

9.      As part of their voter registration drives, ACORN and Project Vote voter registration workers go into low- and moderate-income minority communities, seek out individuals, including ACORN members, who are not registered to vote, and help them to register.  During such drives, ACORN and Project Vote volunteers encourage all individuals who are eligible to register and vote.

10.      ACORN and Project Vote's registration drives have been extremely successful.  During the 2004 election cycle, ACORN and Project vote assisted over 1,000,000 applicants to complete and return voter registration applications to elected officials.

11.      ACORN began its 2006 voter drive during the week of February 6.  When H.B. 3 and the challenged regulations went into effect, ACORN was in the midst of conducting voter registration drives in five cities in Ohio, including Akron, Dayton, Cincinnati, Columbus and Cleveland.  As a result of the new law and the Secretary of State's actions, ACORN has been forced to drastically cut back on its voter registration activities in Ohio.

*People For the American Way Foundation  and Community of Faith Assemblies Church*

12.      Plaintiff People For the American Way Foundation ("PFAWF") is a nonpartisan, non-profit organization incorporated in Delaware and recognized as tax-exempt under section 501(c)(3) of the Internal Revenue Code by the Internal Revenue Service, with its principal place of business in Washington, D.C.  Throughout its history, PFAWF has sought to promote civic participation, including voter registration and turnout, particularly among young people and minority communities.

13.     In conjunction with its African American Ministers Leadership Council ("AAMLC"), PFAWF has operated since 2003 a nonpartisan voter registration and civic participation program, focusing on African-American voters, called Victory though Voting ("VTV").  Through VTV, individual churches and other community institutions seek to assist in registering and turn out voters in their communities, using paid workers and volunteers from those communities, with training, technical, and other assistance from PFAWF and AAMLC members.  In 2004, VTV registered over 59,000 voters, including more than 24,000 in Ohio.

14.     Plaintiff Community of Faith Assemblies Church ("Community of Faith") is a 250-member Independent Pentecostal church in the predominantly African-American lower east side of Cleveland. The senior pastor of Community of Faith, Dr. Tony Minor, is a member of AAMLC, and the church participated in VTV in 2004 and is working with PFAWF to do so in 2006 as well.

15.     When H.B. 3 and the challenged regulations went into effect, PFAWF was in the midst of organizing VTV voter registration programs in Ohio involving Community of Faith and other churches and community institutions. As a result of the new law and the Secretary of State's actions, PFAWF and Community of Faith have been forced to drastically alter and cut back on their voter registration activities in Ohio. The new law has also harmed the registration activities of PFAWF and Community of Faith by discouraging churches and community members from participating in such activities.

*Common Cause*

16.     Plaintiff Common Cause is a nonpartisan, 501(c)(4) non-profit advocacy organization incorporated in Washington, DC, where its principal place of business is located.  Its Ohio office is located at 50 West Broad Street, Suite 1705, Columbus, OH 43215.

17.     Since its founding in 1970, Common Cause has been a vehicle for citizens to make their voices heard in the political process through voting, mobilization and lobbying for the public interest.  It has nearly 300,000 members and supporters and 38 state organizations.

18.     Common Cause's mission is to work at the state and local level to reform the system of voting in the United States.  It supports easing barriers to voting, election administration designed for the voters, openness throughout the process, nonpartisan supervision of elections and making the way Americans vote a higher priority at all levels of government.

19.     Common Cause Ohio has registered voters in Ohio since its inception in 1971, working in recent years in coordination with other nonpartisan Ohio-based community groups, such as fraternal societies, churches, social clubs, and unions.

20.     Voter registration is an integral part of Common Cause's mission to enhance citizen participation and government accountability.  As an organization with limited funds, Common Cause Ohio commits funds and staff time to collaborative voter registration drives when there are relevant issues at stake in the election.

21.     If the challenged restrictions remain in place, Common Cause Ohio will severely curtail, if not cease outright, its voter registration activities in Ohio in 2006 and in the future.

*American Association of People with Disabilities*

22.     American Association of People with Disabilities ("AAPD") is the largest national nonprofit cross-disability member organization in the United States, dedicated to ensuring economic self-sufficiency and political empowerment for the more than 56 million Americans with disabilities. AAPD works in coalition with other disability organizations for the full implementation and enforcement of disability nondiscrimination laws, particularly

the Americans with Disabilities Act (ADA) of 1990, the Rehabilitation Act of 1973, the National Voter Registration Act of 1993, and the Help America Vote Act of 2002.

23.    AAPD has 548 individual members in Ohio. In addition to its individual members, since 1995 AAPD has conducted a variety of annual programs. Because in 2000 965,202 Ohioans with disabilities did not vote, AAPD has made a commitment to have a permanent presence in Ohio, the primary purpose of which is to increase the voter registration and participation of people with disabilities. In 2004 AAPD, in conjunction with its Ohio partners, conducted an extensive nonpartisan voter registration and education campaign. Tens of thousands of Ohioans with disabilities, who were not registered to vote, were contacted by mail, phone, email, and/or in-person, and given the opportunity to do so. Thousands of phone calls were made and voter registration forms mailed to non-registered persons with disabilities. Additionally AAPD staff, as well as the staff of more than twenty Ohio-based disability organizations, conducted face-to face voter registration conversations using the state's postcard registration form.

24.    Three of Ohio's disability leaders are significant participants in the Disability Vote Alliance. The mission of the Disability Vote Alliance, developed by the AAPD in 2005, is to maximize the voting strength of Americans with disabilities through nonpartisan voter education, registration and mobilization efforts. The Alliance seeks to expand the involvement of people with disabilities and other community advocates across all levels of the electoral process to ensure that elected officials are responsive to the needs of the disability community at the local, state, and national level.

25.    The AAPD has made a permanent commitment to increasing the nonpartisan political participation of Ohioans with disabilities

*Individual Plaintiffs*

26.     Plaintiff John R.T. May is a resident of Akron, Ohio, over 18 years of age, and a United States citizen who has been employed by ACORN since March 2006 to coordinate ACORN's voter registration drives and to assist citizens to register to vote in Akron, Ohio.  From March until May 2, 2006, Mr. May assisted Ohio citizens to register to vote and supervised other ACORN employees to do the same.  Mr. May stopped engaging in voter registration activities on May 2, 2006, the effective date of H.B. 3, because he fears criminal prosecution under the new law.  Mr. May wants to communicate and associate with potential voters to assist them to register, and to associate with ACORN to engage in voter registration activities, but his speech and association has been chilled by H.B. 3.

27.     Plaintiff Linda Scammicca is a resident of Columbus, Ohio, over 18 years of age, and a United States citizen who has assisted citizens to register to vote as a volunteer for ACORN for over a year.  During that time, she has assisted more than 200 citizens to register to vote outside of public service agencies and parole offices in her community.  To do so, Ms. Scammicca obtained voter registration application forms from ACORN, and she gave the completed application forms to ACORN for submission to the appropriate state offices.  Ms. Scammicca ceased her voter registration activities in early May 2006, upon learning of the new restrictions under H.B. 3, because she fears criminal prosecution for participating in voter registration activities.  Ms. Scammicca would like to continue assisting members of her community to register to vote and to associate with ACORN for voter registration but her speech and association has been chilled by the new law and regulations.

28.     Plaintiff Mary Keith is a resident of Cleveland, Ohio, over 18 years of age, and a United States citizen who has been a member of ACORN for two years and is a president of one of ACORN's street clubs and a chapter chairperson.  Ms. Keith has previously volunteered for

ACORN's voter registration drives and has coordinated ACORN-sponsored drives to register new voters in Clevand-area high schools. In 2006, Ms. Keith scheduled voter registration days in a number of Cleveland high schools and assisted eligible students to register to vote in two schools. She abandoned her remaining scheduled voter registration days when she learned of the new restrictions in H.B. 3. She is no longer participating in voter registration activities because she fears criminal prosecution for failure to comply with the law's vague and onerous restrictions. It would be very difficult, burdensome, and time-consuming for her to have to personally submit the forms she collects to the boards of elections or the Secretary of State instead of associating with ACORN because, among other reasons, she volunteers as a school aide during the business hours of the relevant state offices. Ms. Keith would like to continue her volunteer voter registration activities and to associate with ACORN to do so, but her speech and association has been chilled by the new law and regulations.

29.     The organizational plaintiffs also bring claims on behalf of their members who are over 18 years of age, United States citizens, and residents of Ohio eligible to vote, but not registered to vote. These members will want to vote in the upcoming federal and state elections but will not register to vote, or will find it extremely difficult to do so, but for the efforts of groups like Plaintiffs to register them.

**Defendants**

30.     Defendant J. Kenneth Blackwell is the Secretary of State of Ohio. Defendant Blackwell is responsible for overseeing the elections process and appointing the members of boards of elections in each of Ohio's 88 counties. In this capacity, he supervises the administration of election laws; investigates election fraud and irregularities; trains election officials; promulgates

rules, practices, and procedures to implement laws regarding Ohio elections; and compels the observance of Ohio election law by election officers in the counties of Ohio.

31. Jim Petro is the Attorney General of Ohio. Defendant Petro is the lawyer for the State of Ohio and its departments, boards and agencies. Defendant Petro works with local law enforcement agencies at their request and provides criminal justice support services. Occasionally, at the invitation of local prosecutors, attorneys in Defendant Petro's office will provide special prosecutors in criminal cases.

32. William D. Mason is the prosecuting attorney for Cuyahoga County, Ohio. Defendant Mason has the responsibility and the authority to investigate and prosecute crimes in the County of Cuyahoga.

33. Sherri Bevan Walsh is the prosecuting attorney for Summit County, Ohio. Defendant Walsh has the responsibility and the authority to investigate and prosecute crimes in the County of Summit.

## JURISDICTION AND VENUE

34. This case arises under the Constitution, laws, or treaties of the United States. This Court has subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a), and 42 U.S.C. § 1983.

35. This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

36. Venue in this district and jurisdiction is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district.

## VOTER REGISTRATION ACTIVITY IN OHIO

**The Importance of Plaintiffs' Voter Registration Activities to the Franchise in Ohio**

37.     A substantial number of Ohio citizens who register to vote each year are registered with the assistance of private citizens and groups, including plaintiffs.

38.     In 2004, over 300,000 voter registration applications were submitted by third party organizations in Ohio.

39.     During the 2004 election cycle, ACORN and Project Vote assisted over 189,000 Ohioans to register to vote.

40.     During the 2004 election cycle, Common Cause Ohio's voter registration drive resulted in at least 2,500 new registrations.

41.     Ohio citizens who live in predominantly low-income and minority communities rely more heavily on plaintiffs' voter registration efforts than do members of other communities. These citizens will be disproportionately harmed by the burdens imposed on plaintiffs by the new law.

42.     Voter registration rates for low-income citizens, who are disproportionately people of color, are dramatically lower than the rates for more affluent citizens.  According to a recent report by the United States Census Bureau, "[c]itizens with higher incomes were more likely to register and to vote.  The voting rate among citizens living in families with annual incomes of $50,000 or more was 77 percent, compared with 48 percent for citizens living in families with incomes under $20,000."

43.     This disparity arises, in part, because low-income citizens change addresses more frequently, visit state motor vehicle offices less frequently (where many Ohio citizens register to vote), have lower literacy rates, less internet access (and thus less ability to obtain voter registration applications online), and are more dependent on public transportation (making it more difficult to travel to register at a government office).

44.     Plaintiffs' efforts to assist these and other voters to register are consistent with the goals of the National Voter Registration Act of 1993 ("NVRA").  The NVRA was enacted by Congress to "increase the number of eligible citizens to register to vote in elections for Federal office," and courts have recognized that it "impliedly encourages" private voter registration drives like those conducted by plaintiffs.

45.     Plaintiffs' prior voter registration efforts have resulted in a significant expansion of the franchise in Ohio and a strengthening of the state's and the nation's democracy.  The success of these efforts underscores the harm imposed by the challenged law and regulations not only to plaintiffs' constitutional rights but also to the public interest.

**The Importance of Plaintiffs' Voter Registration Activities to Core Political Speech and Association in Ohio**

46.     For plaintiffs, their employees, members, and volunteers, voter registration is a uniquely effective way to enhance participation and accountability in our democracy.

47.     Plaintiffs have conducted, and would like to continue conducting, voter registration drives to strengthen American democracy, expand the franchise, and promote civic participation.  Through their voter registration activities, plaintiffs engage in and promote core political speech and association that is essential to American democracy.

48.     Each year, in order to advance these First Amendment objectives, plaintiffs persuade thousands of Ohio citizens to register to vote.  They do so by talking to potential voters in face-to-face interactions in diverse communities across the state.  These conversations occur at community events, religious services, workplaces, schools, malls, bus stops, and other places where citizens congregate.  They also occur on citizens' front porches and in their living rooms when plaintiffs send members, volunteers, and employees door-to-door to register voters in residential communities.

49.     Plaintiffs' success in registering new voters depends not only on their ability to persuade others of the importance of registering to vote.  It also depends on their ability to assist others to properly fill in applications, to collect the applications, to review the applications for errors or omissions, to assist applicants to correct those errors or omissions, to deliver the applications to the appropriate state offices, and periodically to follow up and ensure that the state properly adds the new voters to the rolls.

**Plaintiffs' Voter Registration Procedures**

*Project Vote and ACORN*

50.     In their voter registration drives, ACORN and Project Vote use the registration forms prescribed in section 3501.14(A) of the Ohio Revised Code, and section 1973gg-4(a)(2) of the United States Code.

51.     ACORN compensates persons that circulate voter registration forms or assist persons in completing or returning those forms.  Volunteers also work with ACORN in its voter registration drives.

52.     Project Vote and ACORN have adopted a comprehensive set of procedures for their voter registration drives.  These procedures are designed to ensure that their voter registration activities engage members of their communities, result in the timely submission of complete and accurate voter registration forms, and ensure that the citizens that they register are added to the voter registration rolls

53.     ACORN begins by hiring workers from the communities where it seeks to increase voter registration.  It trains those workers in the voter registration laws and how to circulate voter registration forms and assist people in completing the forms.  After training its workers, ACORN

suggests locations where its workers can find unregistered citizens to help them register to vote, and tracks its workers as they go out into their communities to register their fellow citizens.

54.     Hiring workers from the community is particularly important because those employees have more success in finding the times and areas where eligible applicants gather and can better relate to community members and understand community issues relevant to prospective voters.

55.     ACORN collects all voter registration applications collected by a worker at the end of each shift, and visually inspects each to ensure its workers properly assist eligible citizens in accurately and fully completing voter registration forms through visual inspection of each of those forms.  ACORN quality control specialists will also call voters who provide a telephone number on their voter registration application forms to verify that the registration form contains accurate information.  The forms are tracked by worker and by shift, and ACORN records the number and quality of the voter registration applications and the results of the calls in order to track performance.  After this review, the voter registration applications are stored in a secure place in the ACORN office until they are submitted to elections officials on a regular schedule.

56.     ACORN requires workers to turn all mail voter registration applications collected on a shift into ACORN at the end of the shift because ACORN wants to be able to account for applications and conduct quality control on the applications.  ACORN also believes its office is more secure than a worker's place of residence.

57.     It is important for ACORN to review each voter application collected by its workers in order to meets ACORN's objective of transmitting complete applications for eligible voters. This benefits ACORN in that it helps ensure that the citizens it helps to register are added to the official list of registered voters, and it benefits the state in that it ensures that the forms it submits to election officials are complete and accurate and thus easier to process. It is also important for

ACORN to implement an effective voter registration application tracking procedure so that it can monitor whether the applicants who received assistance from ACORN are added to the official lists of eligible voters.

58.     When an erroneous or incomplete application is found, ACORN quality control specialists follow up with the applicant to assist him or her to correct or complete the application. If the applicant cannot be contacted, ACORN flags the application with potentially incomplete or erroneous information for election officials when it submits the application to the state.

59.     Once forms are submitted to the state, ACORN also monitors whether the individuals whose applications it submits to the state are added to the official voter database.  This monitoring provides feedback to improve ACORN's employee training as well as information on potential problems with the state registration system.  For example, verification efforts in other states have revealed problems with states' computer software.

60.     ACORN also cooperates with election officials in any investigation that would lessen voter registration fraud.

61.      ACORN utilizes these procedures to maximize the number of eligible voters added to the rolls, to minimize errors and to prevent registration fraud.  These procedures help guarantee that the voter registration applications collected by ACORN's workers are completed by eligible applicants and processed by the state.

62.     A thorough effective quality control program allows ACORN to identify voter registration workers who are submitting incomplete or illegitimate voter registration applications, and to address, correct, and prevent any problems.

63.     These quality control procedures and others are embodied in Project Vote's Training Manual for Voter Registration.

*PFAWF and Community of Faith*

64.      PFAWF's VTV procedures for Ohio, like those of other plaintiffs, call for community voter registration workers to be thoroughly trained by PFAWF on how to assist applicants to properly complete voter registration applications and to comply with state and federal law.  After collecting voter registration applications from eligible citizens in their congregations and communities, VTV workers are to turn in voter registration applications to their church or other supervising community institution, which then visually inspects every application for errors and completeness, follows up with applicants who have submitted erroneous or incomplete applications to ensure that complete applications are submitted, records and tracks information about applications turned in by each worker, delivers all completed applications promptly to election officials, monitors whether such completed applications are added to the voter rolls, and follows up with voter turnout efforts.  These steps are important to provide quality control with respect to voter registration workers, to better assist voters and election officials by delivering complete registration applications, and to facilitate effective voter turnout efforts focusing on properly registered voters.

*Common Cause*

65.      In 2004, Common Cause participated in a coalition of several organizations collaborating to assist citizens to register to vote in Ohio.  As part of this coalition, Common Cause had responsibility in Franklin County and eight surrounding counties for recruiting volunteers, training them in proper voter registration procedures, coordinating their registration efforts within their communities, collecting their forms when complete, checking those forms for completeness and accuracy, and regularly returning them to local boards of elections.  Common Cause would like to continue assisting citizens to register to vote in this manner.

66.     To start its voter registration drives, Common Cause would recruit volunteers through promotion and marketing, including a volunteer hotline.  Common Cause would sort those volunteers into groups of twenty-five, which they would then train on the laws and rules surrounding voter registration, including how to properly complete forms.  Trainings would be prepared in written form by Common Cause from materials provided by the boards of elections, and presented both as a printed manual and a PowerPoint presentation during training sessions.

67.     In order to reach and engage a diverse group of Ohio citizens, Common Cause conducted both neighborhood door-to-door drives (usually captained by a resident of the neighborhood) and tabling at events or outdoor locations, such as block parties, concerts, churches, clubs, malls, and other gathering places.  For instance, Common Cause would often set up a table with registration forms at a neighborhood beauty or barber shop, train a staff member in proper procedures, and then collect forms weekly. During these voter registration drives, volunteers would encourage citizens to register and vote.  Several people would staff the same table during the course of the day.

68.     For door-to-door drives, Common Cause would cluster volunteers by their residences, so that volunteers were encouraging their own neighbors to register and vote.  One volunteer in a cluster would serve as a block captain, and receive additional training on quality control.  The captain's house, if he lived in the area, would become a rallying and collection point for the volunteers out in the neighborhood.  Volunteers would be provided food, and if the targeted neighborhood was geographically dispersed, the team would be provided a car.  The block captain would collect completed forms from volunteers, review the forms for accuracy and completeness, and return the forms in a batch to the Common Cause office at the end of every

week.  For both tabling and door-to-door drives, volunteers would mark their initials on each form they collected.

69.     At headquarters, Common Cause staff, both paid and volunteer, would again check the forms for completeness and accuracy; common mistakes included missing signatures or incomplete addresses.  When incomplete forms were found, the staff would contact voters and try to secure the missing information.

70.     Collected forms were stored at the Common Cause office during the second check, and were personally brought to the boards of elections by a volunteer or staff member every week.

71.     Once the registration deadline had passed, Common Cause went back to those same neighborhoods to do get out the vote work, concentrating on areas where they had registered the largest numbers of voters.

**Plaintiffs' Existing and Planned Voter Registration Activities for 2006**

72.     Project Vote has granted funds to ACORN to conduct a nonpartisan voter registration drive in Ohio in 2006, in the counties of Cuyahoga, Frankly, Hamilton, Lucas, Montgomery, and Summit.

73.     During the 2006 election cycle and prior to the effective dates of the statute, rules, and guidance at issue, ACORN and Project Vote were conducting six voter registration drives as of April 30, 2006.

74.     As of April 30, 2006, ACORN had approximately 74 employees in Ohio providing voter registration forms or assisting persons in completing or returning those forms.

75.     In 2006, PFAWF is currently organizing VTV voter registration activities in Ohio, involving churches like Community of Faith and other community institutions, in the counties of Cuyahoga and Franklin.

76. Common Cause hopes to place a redistricting initiative on the ballot this November.  If it succeeds in doing so, it plans to do voter registration in connection with its support for that initiative, unless these rules remain in effect.

77. Congressional and statewide elections are scheduled for November 7, 2006.  The voter registration deadline for those elections is October 10, 2006.

78. Plaintiffs and thousands of prospective Ohio voters will be irreparably harmed if Plaintiffs are forced to comply with the voter registration requirements at issue in this Complaint.

**THE NEW VOTER REGISTRATION RESTRICTIONS IN OHIO H.B. 3 AND REGULATORY MATERIALS**

79. Amended Substitute House Bill No. 3 of the 126th General Assembly of the Ohio legislature ("H.B. 3") made numerous modifications and additions to the Ohio Elections Code (Title XXXV of the Ohio Revised Code) and changes to certain other election-related statutes, including with respect to voter registration activities.

80. H.B. 3 was signed into law by the Ohio Governor on January 31, 2006, and most of the provisions became effective on May 2, 2006.

81. On May 1, 2006, Defendant Blackwell issued emergency and draft regulations seeking to implement H.B. 3.  At the same time, Defendant Blackwell issued a "Compensated Registrar's Training Manual," an affirmation for voter registration workers to sign, and a new voter registration application form, also purporting to implement the new voter registration provisions in H.B. 3.  The draft regulations were revised and refiled on June 14, 2006, and they become effective on July 14, 2006.

**Registration and Training**

82.     H.B. 3 created Ohio Revised Code § 3503.29, which requires any person who "receives or expects to receive compensation for registering a voter" to register with the Secretary of State prior to conducting voter registration activities.

83.     Section 3503.29 also requires any person who "receives or expects to receive compensation for registering a voter" to complete the training program established by the Secretary of State prior to conducting voter registration activities. Defendant Blackwell promulgated an interactive online computer training program for compensated voter registration workers, and requires that such workers undergo the training one at a time through that program.

84.     Section 3503.29 also requires any person who "receives or expects to receive compensation for registering a voter" to sign an affirmation which includes the voter registration worker's personal information, and to submit a copy of that affirmation each time the worker returns voter registration forms to a board of elections.  Defendant Blackwell has created an affirmation form for each voter registration worker to sign.

85.     As used in Section 3503.29, "'registering a voter' and 'registering voters' includes any effort, for compensation, to provide voter registration forms or to assist persons in completing or returning those forms."

86.     Section 3503.28 provides that the requirements of § 3503.29 will be described in a brochure, to be distributed to any person who requests more than two voter registration forms at one time, and to be posted online.  Defendant Blackwell's "Compensated Registrar's Training Manual" is available online at http://www.sos.state.oh.us/sos/electionsvoter/cvrTrainingInfo.pdf.

**Early Deadlines for Return of Forms**

87.     H.B. 3 amended Ohio Revised Code § 3599.11 to require both compensated and noncompensated workers "to return any registration form entrusted to that person to any board of elections or the office of the secretary of state within ten days after that registration form is completed."  § 3599.11(B)(2)(a), (C)(1).

**Limitations on Place and Manner of "Return"**

88.     H.B. 3 amended Ohio Revised Code § 3503.19 by adding § 3503.19(B)(2)(c): "A person who receives compensation for registering a voter shall return any registration form entrusted to that person by an applicant to any board of elections or to the office of the secretary of state."

89.     Section 3503.19(B) of the Ohio Revised Code now reads, in full, as follows:

> (B)(1) Any person may apply in person, by telephone, by mail, or through another person for voter registration forms to the office of the secretary of state or the office of a board of elections.
> (2)(a) An applicant may return the applicant's completed registration form in person or by mail to any state or local office of a designated agency, to a public high school or vocational school, to a public library, to the office of a county treasurer, to the office of the secretary of state, or to the office of a board of elections.
> (b) Subject to division (B)(2)(c) of this section, an applicant may return the applicant's completed registration form through another person to any board of elections or the office of the secretary of state.
> (c) A person who receives compensation for registering a voter shall return any registration form entrusted to that person by an applicant to any board of elections or to the office of the secretary of state.

90.     H.B. 3 also amended Ohio Revised Code § 3599.11, addressing "offenses and penalties" under Ohio's election law, by adding § 3599.11(B)(2)(a): "No person who helps another person register outside an official voter registration place shall knowingly fail to return any registration form entrusted to that person to any board of elections or the office of the secretary of state."

91.     H.B. 3 also amended Ohio Revised Code § 3599.11 by adding § 3599.11(C)(2): "No person who receives compensation for registering a voter shall knowingly return any registration

form entrusted to that person to any location other than any board of elections or the office of the secretary of state."

92.     Violation of Ohio Revised Code § 3599.11(C)(2) or § 3599.11(B)(2)(a) is either a first-degree misdemeanor or a fifth-degree felony, depending on various factors such as previous convictions, the number of voter registration forms at issue, and whether the violation has caused any person to miss a voter registration deadline.

93.     Defendant Blackwell, in the Secretary of State's "Compensated Registrars Training" manual, interprets these provisions as follows: "No person who receives compensation for registering a voter shall knowingly return any registration form entrusted to that person to any location other than any board of elections or the office of the Secretary of State. R.C. 3599.11(B)(2)(b) and (C)(2)."

94.     Defendant Blackwell has also created an affirmation form for individuals who receive compensation for assisting others to register to vote that requires all such individuals to affirm, under penalty of election falsification: "I will return any properly completed registration form in the time prescribed by law to a county board of elections or the secretary of state's office, and not any other person, group, organization or entity."

95.     On June 5, defendant Blackwell issued an advisory to "All County Boards of Elections," in which he described the new law as requiring that any "person being compensated to register voters must . . . [r]eturn an applicant's completed voter registration form directly to the office of a county board of elections or the secretary of state and shall not, under penalty of law, return the completed form to any other person, group, organization, office, or entity."

**Voter Registration Materials**

96.     Ohio Revised Code § 3503.14(A)(6) requires any person who receives compensation for providing the form or assisting in the completion of the form or returning the form to sign their name and state their employer on the voter registration form itself.  H.B. 3 amended § 3503.14 also to require that person's address on the voter registration form.

97.     Line 15 of the current mail voter registration form promulgated by  Defendant Blackwell requires the address and signature of the compensated person registering the applicant, as well as the name of that person's employer.

## HISTORY OF H.B. 3

98.     H.B. 3 was introduced by Representative Kevin DeWine on January 24, 2005, and referred to the Elections and Ethics Committee.

99.     The original bill focused primarily on requirements mandated by the Help America Vote Act, such as provisional voting and ballot standards.

100.     The Elections and Ethics Committee amended H.B. 3 to mandate that registrants who returned their cards "through another person" must have them returned only to the board of elections in the county in which they resided or to the Secretary of State.  The committee amendments also required paid voter registration workers to register with the Secretary of State and undergo training.

101.     H.B. 3 passed in the Ohio House of Representatives on May 17, 2005.

102.     When introducing the Senate's proposed changes, Senator Kevin Coughlin, the Senate sponsor, stated: "The Senate bill includes other important fraud protections of note, including: . . . key protections for the disabled, senior citizens and home-bound Ohioans to ensure that they receive unbiased assistance in fulfilling their right to be heard through the ballot."

103.    Senator Coughlin also argued that the legislation was necessary because "special interests came from out of state, willing to stop at nothing to affect the results of the election, even if it meant gaming the system through false registrations."

104.    In June 2005, and again in December 2005, the Senate Rules Committee heard testimony regarding the effect of H.B. 3.

105.    Many individuals and organizations warned the Senate Rules Committee that the voter registration restrictions of H.B. 3 would discourage voter registration efforts.

106.     H.B. 3 passed in the Ohio Senate on December 13, 2005.

107.    H.B. 3 was signed into law on January 31, 2006.

108.    H.B. 3 took effect on May 2, 2006, the day of the primary election in Ohio.

109.    The new voter registration restrictions in H.B. 3 and in the accompanying regulatory materials do not serve any legitimate, much less, compelling government interests.  The law and regulatory materials burden far more speech and association than is necessary to accomplish any government interest.

110.    The challenged law and regulatory materials are not necessary to address voter registration fraud.  Ohio law already separately penalizes voter registration fraud in Ohio Revised Code § 3599.11(A), which provides that "[n]o person shall knowingly . . . aid or abet any person to [register in a precinct in which the person is not a qualified voter]," or "knowingly induce any person to" register under more than one name," or "knowingly make any false statement on any form for registration."  Section 3599.11(B)(1) also provides that "[n]o person who helps another person register outside an official voter registration place shall knowingly destroy . . . any completed registration form."

## ATTEMPTS AT CLARIFICATION

111.    On April 28, ACORN wrote to Defendant Blackwell asking for a definitive interpretation of §§ 3503.19(B)(2)(c), 3599.11(B)(2)(a), and 3599.11(C)(2), for fear that they would be misread, in violation of federal law and the apparent intent of the legislature, to require compensated voter registration workers to individually return forms that they had collected directly to the state, preventing them from entrusting those forms to their employer for processing and eventual return.  As described above, ACORN's voter registration operation would be shut down by such an interpretation.

112.    Both before and after this letter was sent, ACORN, through counsel, contacted by telephone Keith Scott, legal counsel in the office of the Secretary of State, to solicit such an interpretation.

113.    Sometime on or before May 1st, 2006, the office of the Secretary of State posted to its web site a "Compensated Registrars' Training" and a "Registration Form For Any Person Who Will Receive, Or Expects To Receive, Compensation For Assisting Any Other Person To Register To Vote," which stated, "If you have been entrusted with a completed voter registration form, you must return the applicant's voter registration form directly to the office of a county board of elections or the Secretary of State.  You shall not, under penalty of law, return the completed form to any other person, group, organization, office or entity."

114.    Between May 1st and May 17th, ACORN through counsel repeatedly contacted Scott and requested that the materials posted to the web site be revised to correctly reflect what ACORN believed to be the requirements of H.B. 3.  Scott indicated verbally that the Secretary of State would not be taking a position on what the law required, despite the apparent interpretation offered by the Training and Registration Form.

115. On May 5, 2006, Project Vote and ACORN again wrote to Defendant Blackwell and to Attorney General Jim Petro requesting assurance that Plaintiffs' voter registration activities—as set forth in Paragraphs __ above—were not prohibited by §§ 3503.19(B)(2)(c), 3599.11(B)(2)(a), and 3599.11(C)(2).

116. The letter also informed Defendant Blackwell of Plaintiffs Project Vote and ACORN's intention to pursue legal relief under the NVRA if such assurance was not given.

117. On May 17, the Attorney General replied and stated that "we are unable to answer your questions or to offer any opinion or advice about your client's processes."

118. The Secretary of State has never responded to this letter.

119. On June 13, 2006, PFAWF wrote to defendant Blackwell raising serious concerns that the rules and practices he promulgated pursuant to H.B. 3 would obstruct voter registration efforts by VTV. In particular, PFAWF's letter explained the burdens caused by the requirement that workers return application forms directly rather than through their churches or other supervising institutions, and by the mandated training through an interactive online program.

120. Although defendant Blackwell did alter the rules to eliminate the requirement that workers not use the United States mail to deliver voter registration forms, a concern also raised by PFAWF, defendant Blackwell has not otherwise responded to the letter or addressed the concerns it raised.

**IMPACT OF H.B. 3 ON PLAINTIFFS' VOTER REGISTRATION ACTIVITY**

121. The provisions of §§ 3503.14, 3503.19, 3503.28, 3503.29, and 3599.11, as well as the Secretary of State's interpretation of those provisions, discussed above, impede the ability of Plaintiffs to conduct their voter registration drives and related speech and association activities.

122.    Plaintiffs' ability to hire workers and use volunteers from the communities where Plaintiffs organize has been made much more difficult by these rules.  Many workers and volunteers are unwilling to take the risk of assisting people register to vote if the consequences of them "returning" voter registration forms to the wrong place could be a felony.  The disclosure requirements for paid workers have a similar chilling effect, as many workers are unwilling to disclose their personal information on the affirmation forms.  Some citizens who wish to register to vote with the assistance of plaintiffs are reluctant to do so because they do not want to have to publicly disclose their association with plaintiffs.  Individual voter registration workers hired by Plaintiffs are refusing to register voters for fear of criminal prosecution.

123.    Due both to logistical constraints and the quality control efforts described above, Plaintiffs' voter registration efforts typically result in different employees or organization supervisors submitting forms to the state of Ohio than those who originally collected them.  The quality control specialists risk being charged with a criminal act if they continue to review applications to monitor their compliance with law and procedure before the applications are returned to boards of election or the Secretary of State.

124.    It will significantly suppress the voter registration drive if each of Plaintiffs' workers or volunteers is required to individually return his or her portion of applications directly to the board of elections, instead the prior procedure of first submitting the completed forms to persons designated by Plaintiffs and delivering the applications to the board in a bundle on a weekly basis.

125.    Defendant Blackwell's requirement of individualized online training for each compensated voter registration worker will make it significantly more difficult for plaintiffs to hire workers in the communities where they operate.  Few individuals in the disadvantaged

communities in which plaintiffs conduct voter registration drives have access to computers, printers, and sufficient internet access to undertake the training. Churches like Community of Faith similarly do not have such access; for example, Community of Faith has only one computer with dial-up internet access via the church's single telephone line, making it extremely difficult for registration workers to undertake training one at a time through an interactive online internet program.

126.    Citizens who would otherwise register through Plaintiffs' efforts are not registering and voting because of the chilling effect that Ohio H.B. 3, with its uncertainty and risk of felony charges, has had.

127.    Because Plaintiffs' efforts are concentrated in part in minority communities, the result of H.B. 3 is that fewer citizens of color will be registered to vote.

## CAUSES OF ACTION

### Count I

**Unconstitutional Vagueness in Violation of the First and Fourteenth Amendments**

128.    Plaintiffs incorporate by reference paragraphs 1 through 127 as if fully set forth here.

129.    Ohio Revised Code §§ 3503.19(B)(2)(c) and 3599.11 require voter registration workers and volunteers to return registration forms only to a "board of elections or the office of the secretary of state."

130.    What it means to "return" a registration form is vague because it is not clear whether the activities of Plaintiffs described above constitute a failure to "return" the forms as specified.

131.    What it means to be "compensated to register voters" is vague because it is not clear whether volunteers who receive payment for expenses, food and drink, or gifts, or employees

whose duties include assisting voters to register but whose primary duties lie elsewhere, are required to register and undergo training.

132. Neither the Elections code nor the rules promulgated by the Secretary of State provide any guidance as to whether §§ 3503.19(B)(2)(c) and 3599.11 criminalize the activities of Plaintiffs.

133. Plaintiffs have requested clarification from the Attorney General and the Secretary of State, to no avail.

134. The vagueness of these provisions has caused Plaintiffs to cease voter registration efforts for fear of prosecution.

135. H.B. 3's registration return provisions are unconstitutionally vague, in violation of the First and Fourteenth Amendments to the United States.

## Count II

### Undue Burden on Political Speech and Association
### In Violation of the First and Fourteenth Amendments

136. Plaintiffs incorporate by reference paragraphs 1 through 127 as if fully set forth here.

137. Ohio Revised Code §§ 3503.19(B)(2)(c) and 3599.11 require voter registration workers and volunteers to return registration forms only to a "board of elections or the office of the secretary of state."

138. If these code provisions do require voter registration workers and volunteers to personally return forms to the boards of elections or the office of the Secretary of State and not to their employer or affiliated organization for processing and return, then the provisions unduly Plaintiffs' speech and association in violation of the First and Fourteenth Amendments.

139. This provision unduly burdens Plaintiffs' speech and association in violation of the First and Fourteenth Amendments.

## Count III

### Undue Burden on Political Speech and Association of Compensated Voter Registration Workers In Violation of the First and Fourteenth Amendments

140.    Plaintiffs incorporate by reference paragraphs 1 through 127 as if fully set forth here.

141.    H.B. 3 requires that each paid voter registration worker pre-register with the state.  Such pre-registration requires disclosure of her name, permanent address, and date of birth, signing an affirmation, and completion of an online training program, before distributing voter registration forms and assisting citizens to register to vote.  She must also disclose her name, address, and employer organization on each voter registration form she completes.

142.    Pre-registration, training, affirmation, disclosure, or personal return are not required of volunteer voter registration workers.

143.    These requirements unduly and discriminatorily burden the political speech of compensated voter registration workers and their employers, in violation of the First and Fourteenth Amendments to the United States Constitution.

## Count IV

### Violation of Section 2 of the Voting Rights Act

144.    Plaintiffs incorporate by reference paragraphs 1 through 127 as if fully set forth here.

145.    Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973(a), forbids any voting standard, practice or procedure "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

146.    H.B. 3's effect is to hamper paid voter registration efforts which target racial minority communities.

147.    The result of H.B. 3 is the denial or abridgement of the right to vote of racial minorities.

148.    H.B. 3 is in violation of section 2 of the Voting Rights Act.

## Count V

**Violation of the National Voter Registration Act of 1993 due to the Ohio Voter Registration**

**Form**

149.    Plaintiffs incorporate by reference paragraphs 1 through 127 as if fully set forth here.

150.    Ohio Revised Code § 3503.14 requires the inclusion of information on mail voter registration applications beyond what is permitted by the NVRA.

151.    The Election Assistance Commission, under 42 U.S.C. § 1973gg-7, is charged with developing a voter registration application form to be used for elections for federal office.

152.    The mail voter registration form developed by the Election Assistance Commission pursuant to 42 U.S.C. § 1973gg-7 does not require the inclusion of any information from any person other than the applicant.

153.    The mail registration form developed by the Election Assistance Commission may require only such information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  42 U.S.C. § 1973gg-7(b)(1).

154.    Under 42 U.S.C. §1973gg-4, states must "accept and use" the Elections Assistance Commission form.  States may also develop their own form for use in registering voters for Federal office.

155.    Pursuant to 42 U.S.C. §§ 1973gg-4 and -7, if states develop their own voter registration form for use in Federal elections, it must also include only information requested on the Elections Assistance Commission form.

156.   The mail voter registration form designed by the Secretary of State pursuant to § 3503.14 requires the inclusion of information that is not required on the voter registration form produced pursuant to 42 U.S.C. § 1973gg-7.

157.   Ohio's voter registration form violates the NVRA.

## Count VI

### Violation of the National Voter Registration Act of 1993 due to the Restriction on Voter Registration Efforts

158.   Plaintiffs incorporate by reference paragraphs 1 through 127 as if fully set forth here.

159.   The National Voter Registration Act of 1993, 42 U.S.C. § 1973gg, has the purpose of "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office."

160.   The NVRA further provides that the "chief State election official of a State shall make [voter registration application] forms . . . available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs." 42 U.S.C. § 1973gg-4(3)(b).

161.   H.B. 3's amendment of Ohio election law impedes the purpose and intent of the NVRA.

162.   The NVRA prohibits states from impeding individuals from registering to vote in a federal election by a means mandated by the NVRA.

163.   Ohio's voter registration restrictions violate the NVRA.

## Count VII

### Undue Burden on Political Speech and Association of Voters
### In Violation of the First and Fourteenth Amendments

164.   Plaintiffs incorporate by reference paragraphs 1 through 127 as if fully set forth here.

165.    In order to register through a third-party compensated voter registration worker, each of the voter members of plaintiffs must have their association with a particular voter registration organization disclosed.

166.    The disclosure of this information burdens the voter plaintiffs' right to free association with voter registration organizations, in violation of the First and Fourteenth Amendments.

### Count VIII

**Undue Burden on the Right to Vote in Violation of the First and Fourteenth Amendments**

167.    Each of the voter members of plaintiffs would not be able to register to vote but for the voter registration efforts of third-party voter registration groups.

168.    H.B. 3 and its implementing rules and procedures will prevent the voter plaintiffs from exercising their right to vote and to participate in the political process by forcing third-party groups to stop registering voters, or seriously to limit their voter registration activities.

169.    As a result, the plaintiffs' fundamental rights to vote and to participate in the political process are severely burdened by the challenged law, in violation of the First and Fourteenth Amendments.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that:

a.      This Court enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declaring the registration, affirmation, training, registration form disclosure, ten-day deadline, and limitation on return provisions for voter registration in H.B. 3 and in the accompanying regulatory materials to be unconstitutional;

b. This Court enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declaring the registration, affirmation, training, registration form disclosure, and limitation on return provisions for voter registration in H.B. 3 and in the accompanying regulatory materials to be a violation of section 2 of the Voting Rights Act;

c. This Court enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declaring the registration, affirmation, training, registration form disclosure, and limitation on return provisions for voter registration in H.B. 3 and in the accompanying regulatory materials to be a violation of and preempted by the NVRA;

d. This Court enter a preliminary and permanent injunction pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1973gg-9(b), and Fed. R. Civ. P. 65 restraining and enjoining Defendants from prosecuting Plaintiffs for their voter registration activities and from enforcing those provisions of H.B. 3 that violate the Constitution and laws of the United States;

e. This Court award Plaintiffs nominal damages;

f. This Court grant Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1973gg-9(c), 42 U.S.C. § 1983, and 42 U.S.C. § 1988(b); and

g. This Court grant Plaintiffs such other and further relief as may be just and equitable.

Respectfully submitted,

/s/ DONALD J. McTIGUE

_____
Donald J. McTigue (OH 0022849)
*Trial Counsel*
Mark A. McGinnis (OH 0076275)
MCTIGUE LAW GROUP
886 North High Street
Columbus, OH 43214
Tel: (614) 263-7000
Fax: (614) 263-7078
mctiguelaw@rrohio.com

*Counsel for Plaintiffs*


Karl J. Sandstrom*
Ezra W. Reese*
PERKINS COIE LLP
607 14th Street NW
Suite 800
Washington, DC 20005
Tel: (202) 628-6600
Fax: (202) 434-1690
KSandstrom@perkinscoie.com

*Counsel for Association of
Community Organizations for
Reform Now, Project Vote, Common
Cause and American Association of
People with Disabilities*


Elliot M. Mincberg*
Devin Willis*
PEOPLE FOR THE AMERICAN WAY
FOUNDATION
2000 M Street N.W. #400
Washington, D.C. 20036
Tel: (202) 467-4999
emincberg@pfaw.org

*Counsel for People For the
American Way Foundation &
Community of Faith Assemblies
Church*

Brian Mellor (MA 43072)*
1486 Dorchester Avenue
Dorchester, Ma, 02122
TEL: (617) 282-3666
FAX: (617) 436-4878
ELECTIONSCOUNSEL1@PROJECTVOTE
.ORG

*Counsel for Project Vote*

Elizabeth S. Westfall*
ADVANCEMENT PROJECT
1730 M Street NW, Ste. 910
Washington, DC 20036
Tel: (202) 728-9557
Fax: (202) 728-9558
ewestfall@advancementproject.org

*Counsel for Advancement Project*

Wendy R. Weiser*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Fl.
New York, NY 10013
Tel: (212) 998-6130
Fax: (212) 995-4550
Wendy.weiser@nyu.edu

*Of Counsel*

*\* Pro Hoc Vice Motions to Follow*