UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| PROJECT VOTE, ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, COMMON CAUSE OHIO, PEOPLE FOR THE AMERICAN WAY FOUNDATION, COMMUNITY OF FAITH ASSEMBLIES CHURCH, AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, MARY KEITH, JOHN R. T. MAY, and LINDA SCAMMICCA, | CIVIL ACTION NO. 1:06-cv-01628  Judge Kathleen M. O'Malley  Magistrate Judge Perelman |
| Plaintiffs, |  |
| v. |  |
| J. KENNETH BLACKWELL, individually and in his official capacity as Secretary of State, WILLIAM D. MASON, as Prosecuting Attorney for **Cuyahoga** County, Ohio, and SHERRI BEVAN WALSH, as Prosecuting Attorney for **Summit** County, Ohio, |  |
| Defendants. |  |

**PLAINTIFF'S APPLICATION FOR A
PRELIMINARY INJUNCTION**

Plaintiffs, through undersigned counsel, move this Court pursuant to Fed. R. Civ. P. 65(a) for a preliminary injunction preventing Defendants from enforcing Ohio Revised Code §§ 3503.14(A), 3503.19(B)(2)(c), 3503.29, 3599.11(B)(2)(a), and 3599.11(C)(2).

A memorandum of points and authorities and statement of facts which make expedition essential are submitted herewith.

-2-

Plaintiffs request oral argument on this motion.

Respectfully submitted,

/s/ DONALD J. McTIGUE

_____

Donald J. McTigue (OH 0022849)
*Trial Counsel*
Mark A. McGinnis (OH 0076275)
MCTIGUE LAW GROUP
886 North High Street
Columbus, OH 43214
Tel: (614) 263-7000
Fax: (614) 263-7078
mctiguelaw@rrohio.com

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................... 1

II.     STATEMENT OF FACTS........................................................................................ 1

        A.      Plaintiffs' Voter Registration Efforts............................................................. 1

        B.      Passage of H.B. 3 ....................................................................................... 6

        C.      The Effect of H.B. 3 ..................................................................................... 7

                1.      Registration and Training.................................................................. 7

                2.      Return of Forms ............................................................................... 8

                3.      Voter Registration Materials ............................................................ 9

        D.      Plaintiffs' Attempts to Clarify the Effect of H.B. 3 .................................... 10

        E.      Impact of H.B. 3 on Plaintiffs' Voter Registration Activity...................... 11

III.    ARGUMENT ....................................................................................................... 13

        A.      Standards for Issuance of a Preliminary Injunction ................................. 13

        B.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims............... 13

                1.      Plaintiffs Have Standing to Pursue Their Claims.......................... 14

                2.      The Requirements Of Ohio Rev. Code § 3503.29(C) –
                        Which Apply Only To *Paid* Voter Registration
                        Workers – Unconstitutionally Impose On The First
                        Amendment Rights Of Voters And Voter Registration
                        Workers ......................................................................................... 15

                3.      Ohio Rev. Code §§  3503.19(B)(2)(b) and (c),
                        3599.11(B)(2)(a) and (C)(2) Require Voter Workers To
                        "Return" Voter Registration Forms To Particular Places
                        in a Particular Manner Subject To Criminal Penalties,
                        But Do Not Specify Acceptable Methods For Doing So,
                        And Are Therefore Unconstitutionally Vague. ............................ 20

                4.      NVRA Claims ................................................................................. 26

a)    The NVRA Preempts Ohio Law to the Extent that It Impedes a Form of Registration Mandated by the NVRA ..................................................... 27

b)    Ohio Law Limits the Ability of Private Organizations to Conduct Voter Registration Drives in Violation of NVRA ........................................... 31

c)    The Mandatory Training and Registration Requirements of Ohio Law Are a Form of Deputy Registration in Violation of the NVRA ............... 33

d)    NVRA Forbids Ohio's Voter Registration Form Question 15 ...................................................................... 35

C.    Plaintiffs Will Suffer Irreparable Injury .................................................... 39

D.    The Need for a Preliminary Injunction Outweighs Any Harm to Defendants .............................................................................................. 40

E.    Injunctive Relief Is in the Public Interest .................................................. 40

IV.    CONCLUSION ...................................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**

*American Const. Law Found., Inc. v. Meyer*, 120 F.3d 1092 (10th Cir. 1997) .......... 16, 18, 25

*Ass'n of Community Org. for Reform Now v. Miller*, 912 F. Supp. 976 (W.D. Mich. 1995), *aff'd* 129 F. 3d 833 (6th Cir. 1997) ................................................. 26

*Buckley v. American Const. Law Found., Inc.*, 525 U.S. 182 (1999) ................... 16, 17, 19, 21

*Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) ... 14, 27, 29, 32

*Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 324 F. Supp. 2d 1358 (N.D. Ga. 2004) ...................................................................................................... 27

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ....................................................................................................... 36, 38

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ....................................................... 22

*Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1995) ................................................... 26

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ............................... 13

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377 (6th Cir. 2001) ...................................................................................... 40

*Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261 (6th Cir. 1985) ............... 13

*Gade v. Nat'l Solid Wastes Management Ass'n*, 505 U.S. 885 (1992) .............................. 29, 35

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................... 21, 26

*Hernandez v. Woodard*, 714 F. Supp. 963 (N.D. Ill. 1989) .................................... 16

*Hynes v. Borough of Oradell*, 425 U.S. 610 (1976) .............................................. 22, 24

*L.P. Acquisition Co. v. Tyson*, 772 F.2d 201 (6th Cir. 1985) .................................. 41

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ............................... 16, 20, 39

*Meyer v. Grant*, 486 U.S. 414 (1988) .................................................................... 25

*NAACP v. Alabama*, 357 U.S. 449 (1958) ............................................................. 38

*NAACP v. Button*, 371 U.S. 415 (1963) ................................................................................21

*Odle v. Decatur County*, 421 F.3d 386(6th Cir. 2004)............................................................17

*PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243 (6th Cir. 2003).....................13

*Peoples Rights Org., Inc. v. City of Columbus*, 152 F. 3d 522 (6th Cir. 1998).......................14

*Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390
   (6th Cir. 1987)......................................................................................................................22

*Powers v. Ohio,* 449 U.S. 400 (1991) .....................................................................................15

*Project Vote v. Ohio Bureau of Empl. Serv.*, 578 F. Supp. 7 (S.D. Ohio 1982) .....................14

*Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749
   (6th Cir. 1998)......................................................................................................................13

*Secretary of State v. Joseph H. Munson Co., Inc.*, 467 U.S. 947 (1984) ................................19

*United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993) ......................................................22

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980)................................18

**Statutes**

42 U.S.C. § 1973gg ..................................................................................................................14

42 U.S.C. § 1973gg-2.....................................................................................................30, 31, 32

42 U.S.C. § 1973gg-4.........................................................................................................passim

42 U.S.C. § 1973gg-6.....................................................................................................30, 32, 37

42 U.S.C. § 1973gg-7.............................................................................................................36, 37

Ohio Revised Code § 3503.14.................................................................................................9, 35

Ohio Revised Code § 3503.19............................................................................................passim

Ohio Revised Code § 3503.29............................................................................................passim

Ohio Revised Code § 3599.11............................................................................................passim

**Other Authorities**

12/13/05 Senate transcript.......................................................................................................17

H.R. Rep. No. 103-9, *reprinted in* 1993 U.S.C.C.A.N. 105 ..............................................29, 33

Intro. Of Senate Substitute to House Bill 3, Sen. Coughlin, Dec. 6, 2005............................. 16

S. Rep. No. 103-6 ..................................................................................................................... 29

Testimony of Greater Cleveland Voting Coalition, June 14, 2005 ......................................... 18

**Regulations**

O.A.C. 111-12-02.................................................................................................................19, 23

O.A.C. 111-12-03........................................................................................................................7

## I.  INTRODUCTION

Plaintiffs, including organizations engaged in voter registration activities, individuals employed by or volunteering with those organizations to assist Ohio citizens to register to vote, and individuals registering to vote with the assistance of those organizations, bring this Application for a Preliminary Injunction, challenging portions of recently enacted provisions of Ohio law regulating voter registration efforts, Ohio Rev. Code §§ 3503.14(A) with respect to "person[s] registering an applicant," 3503.19(B)(2)(c), 3503.29, 3599.11(B)(2)(a), and 3599.11(C)(2), as well as the Secretary of State's interpretation of those provisions.  These onerous new laws and regulations have forced all of the plaintiffs to seriously curtail or halt their voter registration and related core political speech and association activities.  The challenged laws and interpretations impose a variety of unreasonable restrictions on individuals and groups involved in voter registration activity, including failing to clearly instruct how voter registration forms must be returned; impeding individuals from registering to vote by means required by federal law; requiring each compensated voter registration worker to complete an online training and register with the Secretary of State before they may distribute voter registration forms; requiring certain individuals to disclose for whom they work when distributing voter registration applications; and mandating the use of a voter registration form that is not in compliance with the federal law.

## II.  STATEMENT OF FACTS

### A.  Plaintiffs' Voter Registration Efforts

Each year, plaintiff organizations persuade thousands of Ohio citizens to register to vote.  They do so by talking to potential voters in face-to-face interactions in diverse communities across the state.  These conversations occur at community events, religious services, workplaces, schools, malls, hair salons, bus stops, and other places where citizens congregate.  They also occur on citizens' front porches and in their living rooms when

Plaintiffs send members, volunteers, and employees door-to-door to register voters in residential communities.  Plaintiffs' success in registering new voters depends not only on their ability to persuade others of the importance of registering to vote.  It also depends on their ability to assist others to properly fill in applications, to collect the applications, to deliver them to the appropriate state offices, and periodically to follow up and ensure that the state properly adds the new voters to the rolls.

Project Vote is a nonpartisan, non-profit organization incorporated in Louisiana and recognized as tax-exempt under section 501(c)(3) of the Internal Revenue Code by the Internal Revenue Service.  Project Vote has provided substantial funding and technical assistance to Association of Community Organizations for Reform Now (ACORN) for nonpartisan voter registration drives in communities throughout the country, including in Ohio.  (Catherine Gall Aff. ¶ 9, *attached as* Exhibit A).  ACORN is a non-profit organization incorporated in Louisiana, with offices in Akron, Cincinnati, Cleveland, Columbus, Dayton, and Toledo, Ohio.  Project Vote has a full-time staff person working in Ohio monitoring and providing technical assistance to ACORN's voter registration drives and overseeing its election administration program.

In their registration drives, ACORN's voter registration workers go into low- and moderate-income minority communities, seek out individuals who are not registered to vote, and help them to register.  During such drives, ACORN workers encourage all individuals who are eligible to register and vote.  Because ACORN is able to pay its workers, it is more successful and ACORN's registration drives have been extremely successful.  During the 2004 election cycle, ACORN and Project Vote helped over 1,000,000 Americans, and over 189,000 Ohioans, complete and submit voter registration applications.  (*Id.* ¶ 8).

Project Vote has granted funds to ACORN to conduct a nonpartisan voter registration drive in Ohio in 2006, in the counties of Cuyahoga, Franklin, Hamilton, Lucas, Montgomery, and Summit.  During the 2006 election cycle and prior to the effective dates of the statute,

rules, and guidance at issue, ACORN was conducting six voter registration drives as of April 30, 2006.  As of April 30, 2006, ACORN had approximately 74 employees in Ohio providing voter registration forms or assisting persons in completing or returning those forms.  (*Id.* ¶ 20).

In their voter registration drives, ACORN use the registration forms prescribed in section 3501.14(A) of the Ohio Revised Code, and section 1973gg-4(a)(2) of the United States Code.  ACORN compensates persons that provide voter registration forms or assist persons in completing or returning those forms.  ACORN hires workers from the communities where it wants to increase voter registration. (*Id.* ¶ 10). After training its workers, ACORN suggests locations where they can find unregistered citizens to help them register to vote, and tracks its workers as they go out into their communities to register their fellow citizens.(*Id.*)

ACORN collects all voter registration applications collected by a worker at the end of shift, and ensures its workers properly assist eligible citizens in accurately and fully completing voter registration forms through visual inspection of each of those forms. ACORN staff also calls voters who provided a telephone number on the form to verify that the registration form contains accurate information.  The forms are tracked by worker and by shift, and ACORN records the number and quality of the voter registration applications and the results of the calls in order to track performance.  After review, the voter registration applications are stored in a secure place in the ACORN office until they are submitted to elections officials on a regular schedule.  (*Id.*)

ACORN requires workers to turn all mail voter registration applications collected on a shift into ACORN at the end of the shift because ACORN wants to be able to account for applications and identify omissions or errors on the applications.  ACORN's office is also more secure than a worker's place of residence.  ACORN reviews each voter application

collected by its workers, and it tracks whether the state has added the applicant to the official lists of eligible voters.(*Id.* ¶ 13).

When an erroneous or incomplete application is found, ACORN staff will follow up with the applicants to assist them to either correct or complete the application.  If the applicant cannot be contacted, ACORN will flag the application for election officials when it is returned to the state.  Once forms are returned, ACORN also monitors whether the individuals whose applications it submits to the state are added to the official voter database. ACORN also cooperates with election officials in any investigation that would lessen voter fraud.  (*Id.* ¶ 10).

People For the American Way Foundation ("PFAWF") is a nonpartisan, non-profit organization incorporated in Delaware and recognized as tax-exempt under section 501(c)(3) of the Internal Revenue Code by the Internal Revenue Service.   (Rev. A.D. Givens Aff. ¶ 2, *attached as* Exhibit B).  In conjunction with its African American Ministers Leadership Council ("AAMLC"), PFAWF has operated since 2003 a nonpartisan voter registration and civic participation program, focusing on African-American voters, called Victory though Voting ("VTV"). (*Id.*¶ 3).   In 2004, VTV registered over 59,000 voters, including more than 24,000 in Ohio.  (*Id.*)  Community of Faith Assemblies Church ("Community of Faith") is a 250-member Independent Pentecostal church in the predominantly African-American lower east side of Cleveland. The senior pastor of Community of Faith, Dr. Tony Minor, is a member of AAMLC, and the church participated in VTV in 2004 and is working with PFAWF to do so in 2006 as well.  (*Id.* ¶ 4)

In 2006, PFAWF is currently organizing VTV voter registration activities in Ohio, involving churches like Community of Faith and other community institutions, in the counties of Cuyahoga and Franklin.  VTV procedures for Ohio call for community voter registration workers to be thoroughly trained by PFAWF and to turn in voter registration applications to their church or other supervising community institution, which would then

visually inspect every application for errors and completeness, follow up with applicants who have submitted erroneous or incomplete applications to ensure that complete applications are submitted, record and track information about applications turned in by each worker, deliver all completed applications promptly to election officials, monitor whether such completed applications are added to the voter rolls, and follow up with voter turnout efforts. (*Id.* ¶ 6)

Common Cause/Ohio ("Common Cause") is a nonpartisan, 501(c)(4) non-profit advocacy organization.  (Samuel Gresham Aff. ¶ 1, *attached as* Exhibit C).  Common Cause has registered voters in Ohio since 1971.  (*Id.* ¶ 4).  During the 2004 election cycle, Common Cause's voter registration drive resulted in at least 2,500 new registrations.  (*Id.* ¶9).  Common Cause hopes to place a redistricting initiative on the ballot this November.  If it succeeds in doing so, it plans to do voter registration in connection with its support for that initiative, unless these rules remain in effect.  (*Id.* ¶¶ 6, 19).

In order to reach and engage a diverse group of Ohio citizens, Common Cause conducts both neighborhood door-to-door drives (usually captained by a resident of the neighborhood) and tabling at events or outdoor locations, such as block parties, concerts, churches, clubs, malls, and other gathering places.  (*Id.* ¶ 11).  In registering people to vote both at particular locations and in canvassing door-to-door, volunteers encourage citizens to register and vote.  Several people staff the same table during the course of the day.  (*Id.* ¶ 13).  At headquarters, Common Cause staff, both paid and volunteer, checks the forms for completeness and accuracy; common mistakes included missing signatures or incomplete addresses.  When incomplete forms were found, the staff would contact voters and try to secure the missing information.  (*Id.* ¶ 15).  Collected forms are stored at the Common Cause office during the second check, and are personally brought to the boards of elections by a volunteer or staff member every week.  (*Id.* ¶ 16).  Once the registration deadline passes, Common Cause goes back to those same neighborhoods to do get out the vote work, concentrating on areas where it registered the largest numbers of voters.  (*Id.* ¶ 18).

The American Association of People with Disabilities ("AAPD") is the largest national nonprofit cross-disability member organization in the United States, dedicated to ensuring economic self-sufficiency and political empowerment for the more than 56 million Americans with disabilities. (James Dickson Aff. ¶ 2). AAPD has 548 individual members in Ohio. (*Id.* ¶ 3) AADP has made a commitment to have a permanent presence in Ohio, the primary purpose of which is to increase the voter registration and participation of people with disabilities. (*Id.* ¶ 6).

In 2004 AAPD, in conjunction with its Ohio colleagues, conducted an extensive nonpartisan voter registration and education campaign. Tens of thousands of Ohioans with disabilities who were not registered to vote were contacted by mail, phone, email, and in-person, and given the opportunity to do so. Literally thousands of phone calls were made and voter registration forms mailed to non-registered persons with disabilities. Additionally AAPD staff, along with the staff of more than twenty Ohio-based disability organizations, conducted face-to faces voter registration conversations using the state's postcard registration form.

Many AAPD members depend on voter registration efforts of AAPD and other plaintiff organizations to register to vote. (*Id.* ¶¶ 7-12). Some of AAPD's members may refuse to register to vote using the form promulgated by the Secretary of State because they do not want to disclose that they were helped by AAPD or other organizations. (*Id.* ¶ 14).

Mary Keith and Linda Scammicca are volunteers for ACORN's voter registration efforts. (M. Keith Aff. ¶ 6, *attached as* Exhibit D; L. Scammicca Aff. ¶ 4, *attached as* Exhibit E). John R. T. May is a paid employee of ACORN supervising voter registration drives in Akron, Ohio. (John R.T. May Aff. ¶ 2, *attached as* Exhibit F).

**B. Passage of H.B. 3**

House Bill No. 3 of the 126th General Assembly of the Ohio legislature ("H.B. 3") made numerous modifications and additions to the Ohio Elections Code (Title XXXV of the

Ohio Revised Code) and changes to certain other election-related statutes, including with respect to voter registration activities.  H.B. 3 passed in the Ohio House of Representatives on May 17, 2005.  H.B. 3 passed in the Ohio Senate on December 13, 2005.  H.B. 3 was signed into law on January 31, 2006.  H.B. 3 took effect on May 2, 2006, the day of the primary election in Ohio.

Subsequently, Defendant Blackwell issued a "Compensated Voter Registration Training,"  an affirmation for voter registration workers to sign, and a new voter registration application form, also purporting to implement the new voter registration provisions in H.B. 3.  The draft regulations were revised and refiled on June 14, 2006, and will go into effect on July 14, 2006.

### C.  The Effect of H.B. 3

#### 1.  Registration and Training

H.B. 3 created Ohio Revised Code § 3503.29, which requires any person who "receives or expects to receive compensation for registering a voter" to register with the Secretary of State prior to conducting voter registration activities.  Section 3503.29 also requires any person who "receives or expects to receive compensation for registering a voter" to complete the training program established by the Secretary of State prior to conducting voter registration activities.  Defendant Blackwell is promulgating an interactive online computer training program for compensated voter registration workers, and requiring that such workers undergo the training one at a time through that program.  The Internet is the only available means of receiving the required training.  *See* O.A.C. 111-12-03 (filed June 14, 2006) (*attached as* Exhibit G).

Section 3503.29 also requires any person who "receives or expects to receive compensation for registering a voter" to sign an affirmation which includes the voter registration worker's personal information, and to submit a copy of that affirmation each time the worker returns voter registration forms to a board of elections.  As used in Section

3503.29, "'registering a voter' and 'registering voters' includes any effort, for compensation, to provide voter registration forms or to assist persons in completing or returning those forms."  Section 3503.28 provides that the requirements of § 3503.29 be described in a brochure, to be distributed to any person who requests more than two voter registration forms at one time, and to be posted online.

### 2.  Return of Forms

H.B. 3 amended Ohio Revised Code § 3599.11 to require both compensated and noncompensated workers "to return any registration form entrusted to that person to any board of elections or the office of the secretary of state within ten days after that registration form is completed."  §§ 3599.11(B)(2)(a), (C)(1).  H.B. 3 amended Ohio Revised Code § 3503.19 by adding § 3503.19(B)(2)(b): "Subject to division (B)(2)(c) of this section, an applicant may return the applicant's completed registration form through another person to any board of elections or the office of the secretary of state."  H.B. 3 also added § 3503.19(B)(2)(c): "A person who receives compensation for registering a voter shall return any registration form entrusted to that person by an applicant to any board of elections or to the office of the secretary of state."

H.B. 3 amended Ohio Revised Code § 3599.11 by adding § 3599.11(B)(2)(a): "No person who helps another person register outside an official voter registration place shall knowingly fail to return any registration form entrusted to that person to any location other than any board of elections or the office of the secretary of state."  H.B. 3 also added § 3599.11(C)(2): "No person who receives compensation for registering a voter shall knowingly return any registration form entrusted to that person to any location other than any board of elections or the office of the secretary of state."  Violation of either Ohio Revised Code § 3599.11(C)(2) or § 3599.11(B)(2)(a) is either a first-degree misdemeanor or a fifth-degree felony, depending on various factors such as previous convictions, the number of

voter registration forms at issue, and whether the violation has caused any person to miss a voter registration deadline.

Defendant Blackwell, in the Secretary of State's "Compensated Registrars Training" manual and in the "Voter Registration Training," interprets these provisions as follows:

> No person who receives compensation for registering a voter shall knowingly return any registration form entrusted to that person to any location other than any board of elections or the office of the Secretary of State.  R.C. 3599.11(B)(2)(b) and (C)(2). 'Returning' shall include delivering a voter registration form to an Ohio county board of elections, the Ohio Secretary of State or the United States postal service.  O.A.C. 111-12-02(C).

(Voter Registration Webpage, *attached as* Exhibit H) (Compensated Registrars Training Materials, *attached as* Exhibit I).  In the affirmation that Defendant Blackwell created for all compensated voter registration workers to sign after completing the on-line training, each worker must affirm, "I will return any properly completed registration form in the time prescribed by law to a county board of elections or the secretary of state's office, and not to any other person, group, organization or entity."  (Compensated Registrars Training Manual). On June 5, defendant Blackwell issued an advisory to "All County Boards of Elections," in which he described the new law as requiring that any "person being compensated to register voters must . . . [r]eturn an applicant's completed voter registration form directly to the office of a county board of elections or the secretary of state and shall not, under penalty of law, return the completed form to any other person, group, organization, office, or entity." Advisory No. 2006-05, *attached as* Exhibit J).  The voter registration instructions on Secretary of State's website mirror the advisory and state that the form must be returned "directly to the office of a county board of elections or the Secretary of State." (Voter Registration Webpage)

### 3.  Voter Registration Materials

Ohio Revised Code § 3503.14(A)(6) requires any person who receives compensation for providing the form or assisting in the completion of the form or returning the form to sign

their name and state their employer on the voter registration form itself.  The statute provides no exception where a registrant does not wish to disclose the identity or affiliation of the person who assisted her.  H.B. 3 amended § 3503.14 also to require that person's address on the voter registration form.  Line 15 of the current mail voter registration form promulgated by the Ohio Secretary of State requires the address and signature of the compensated person registering the applicant, as well as the name of that person's employer.

### D.  Plaintiffs' Attempts to Clarify the Effect of H.B. 3

On April 28, ACORN wrote to Defendant Blackwell asking for a definitive interpretation of §§ 3503.19(B)(2)(c), 3599.11(B)(2)(a), and 3599.11(C)(2), because ACORN feared that these provisions would be misread, in violation of federal law and the apparent intent of the legislature, to require compensated voter registration workers to individually return forms that they had collected directly to the state, preventing them from entrusting those forms to their employer for processing and eventual return.  (Letter to Blackwell from McTigue, *attached as* Exhibit K).  As described above, ACORN's voter registration operation would be shut down or seriously curtailed by such an interpretation. Both before and after this letter was sent, ACORN, through counsel, contacted by telephone Keith Scott, legal counsel in the office of the Secretary of State, to solicit such an interpretation.

Between May 1st and May 17th, ACORN through counsel repeatedly contacted Scott and requested that the materials posted to the web site containing the language that voter registration workers may "not" return applications to "any other person group, organization, office or entity" be revised to correctly reflect what ACORN believed to be the requirements of H.B. 3.  Scott indicated verbally that the Secretary of State would not be taking a position on what the law required, despite the apparent interpretation offered by the Training and Registration Form at that time.

On May 5, 2006, Project Vote and ACORN again wrote to Defendant Blackwell and to Attorney General Jim Petro requesting assurance that Plaintiffs' voter registration activities were not prohibited by §§ 3503.19(B)(2)(c), 3599.11(B)(2)(a), and 3599.11(C)(2).  The letter also informed Defendant Blackwell of Plaintiffs Project Vote and ACORN's intention to pursue legal relief under the NVRA and other laws if such assurance was not given.  (Letter to Blackwell & Petro from Sandstrom & Mellor, *attached as* Exhibit L).  On May 17, the Attorney General replied and stated that "we are unable to answer your questions or to offer any opinion or advice about your client's processes."  (Letter from Petro to Sandstrom, *attached as* Exhibit M).  The Secretary of State has never responded to this letter.

On or before June 26, 2006, an interactive voter registration worker training program was posted on the Ohio Secretary of State's web site.  Although the Voter Registration manual, re-titled Voter Registration Materials, no longer contained the language directing that forms could not be returned to "any other person, group, organization, office, or entity," this language was still contained in the affirmation that compensated workers were required to sign, as well as in the advisory to local boards of elections.  (Voter Registration Webpage).

On June 13, 2006, PFAWF wrote to defendant Blackwell raising serious concerns that the rules and practices he promulgated pursuant to H.B. 3 would obstruct voter registration efforts by VTV.  In particular, PFAWF's letter explained the burdens caused by the requirement that workers return application forms directly rather than through their churches or other supervising institutions, and by the mandated training through an interactive online program. (Givens Aff. ¶ 8).

Although defendant Blackwell did alter the rules to eliminate the requirement that workers not use the United States mail to deliver voter registration forms, a concern also raised by PFAWF, defendant Blackwell has not otherwise responded to the letter or addressed the concerns it raised.  (Givens Aff. ¶ 9).

### E.  Impact of H.B. 3 on Plaintiffs' Voter Registration Activity

The provisions of §§ 3503.14, 3503.19, 3503.28, 3503.29, and 3599.11, as well as the Secretary of State's interpretation of those provisions, discussed above, impede the ability of Plaintiffs to conduct their voter registration drives and related speech and association activities.

These rules have seriously impaired Plaintiffs' ability to hire workers from the communities where Plaintiffs organize.  Many workers are unwilling to take the risk of assisting people register to vote if the consequences of them "returning" voter registration forms in the wrong manner could be a felony.  The disclosure requirements for paid workers have a similar chilling effect, as many workers are unwilling to disclose personal information on the affirmation forms. Individual voter registration workers hired by Plaintiffs are refusing to register voters for fear of criminal prosecution.

Plaintiffs' voter registration efforts typically result in different employees or organization staff submitting forms to the state of Ohio than those who originally collected them.  Plaintiffs' staff risk being charged with a criminal act if they continue to review applications to monitor their compliance with law and procedure before the applications are returned to boards of election or the Secretary of State.  At the same time, reviewing applications is the best way to guarantee that no false registrations are submitted to the boards of elections—a felony under § 3599.11(A).  Plaintiffs and their staff are stuck between a rock and a hard place: review applications and risk violating § 3599.11(B) or (C), or submit applications without review and risk violating § 3599.11(A).  It will significantly suppress the voter registration drive if each of Plaintiffs' workers or volunteers is required to individually return his or her portion of applications directly to the board of elections, instead the prior procedure of first submitting the completed forms to persons designated by Plaintiffs and delivering the applications to the board in a bundle on a weekly basis.

Defendant Blackwell's requirement of individualized online training for each compensated voter registration worker will make it significantly more difficult for Plaintiffs to hire workers in the communities where they operate.  Few individuals in those communities have access to computers, printers, and sufficient internet access to undertake the training.  Churches like Community of Faith similarly do not have such access; for example, Community of Faith has only one computer with dial-up internet access via the church's single telephone line, making it extremely difficult for registration workers to undertake training one at a time through an interactive online internet program.  (Givens Aff. ¶ 11).

Moreover, citizens who would otherwise register through Plaintiffs' efforts are not registering and voting because of the chilling effect that Ohio H.B. 3, with its uncertainty and risk of felony charges, has had.

### III.ARGUMENT

### A.  Standards for Issuance of a Preliminary Injunction

This Court is authorized to issue a preliminary injunction under Federal Rule of Civil Procedure 65.  The standard for a preliminary injunction is comprised of the following four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003) (citing *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998)).  These four factors must be balanced, and a party need not meet all four factors to prevail.  *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985).

**B.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

First among the factors to be considered by this Court is the likelihood of plaintiffs' success on the merits.  When the First Amendment is at issue, this factor is often determinative.  *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

**1.  Plaintiffs Have Standing to Pursue Their Claims**

Project Vote, ACORN, Common Cause of Ohio, People for the American Way Foundation, and Community of Faith Assemblies Church are non-partisan, nonprofit groups who are harmed by the actions of Defendants. The challenged law and the Secretary of State's interpretation of that law have forced these plaintiffs to suspend their voter registration activities.  They have standing to bring a claim under the National Voter Registration Act (NVRA), 42 U.S.C. § 1973gg, because defendants' actions, including the Secretary of State's promulgation of an unnecessarily narrow interpretation of H.B. 3 and the Attorney General's refusal to clarify which actions may be subject to criminal prosecution, have, by threatening their workers with criminal prosecution, directly harmed these organizations and prevented them from achieving their mission of registering voters.  This is an injury to a right that is protected by the NVRA, and a court order to comply with the NVRA would address the injury, thus satisfying the required standing analysis.  *Peoples Rights Org., Inc. v. City of Columbus*, 152 F. 3d 522, 527 (6th Cir. 1998); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353 (11th Cir. 2005) (holding that the NVRA legally protects the right to conduct voter registration drives).

The plaintiff organizations also have standing to bring a claims under 42 U.S.C. § 1983.  Plaintiffs' voter registration drives involve activities that are fundamental to American democracy; as such, they are protected core political speech.

The individual plaintiffs have standing under NVRA and § 1983 because they are in danger of incurring criminal liability if they pursue their voter registration activities, and the

-14-

"loss of First Amendment freedom for even a minimal period of time is *per se* irreparable injury." *Project Vote v. Ohio Bureau of Empl. Serv.*, 578 F. Supp. 7, 9 (S.D. Ohio 1982).

Plaintiffs have standing to bring a claim under NVRA and § 1983 on their own behalf, on behalf of their employees and on behalf of those citizens that they seek to register challenging the use and distribution of the voter registration application that the Ohio Secretary of State has promulgated. In *Powers v. Ohio,* 449 U.S. 400, 410-11 (1991), the Supreme Court identified three criteria for organizations, such as Plaintiffs, bringing actions on behalf of third parties. Namely, (1) "[t] he litigant must have suffered an 'injury in fact,'… giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (2) "the litigant must have a close relation to the third party"; and (3) "there must exist some hindrance to the third-party's ability to protect his or her own interests." *Id.* Plaintiffs in this case satisfy there requirements.

### 2. The Requirements Of Ohio Rev. Code § 3503.29(C) – Which Apply Only To *Paid* Voter Registration Workers – Unconstitutionally Impose On The First Amendment Rights Of Voters And Voter Registration Workers

Ohio Rev. Code § 3503.29(C) creates registration, training and disclosure requirements only for persons who are compensated for any of the activities that Ohio defines as "registering voters." *See* Ohio Rev. Code § 3503.29(C); *cf. id.* § 3503.29(E) (excluding enumerated officials and employees from § 3503.29(C) requirements). As used in Section 3503.29, "'registering voters' includes any effort, for compensation, to provide voter registration forms or to assist persons in completing these forms or returning them to the board of elections…." *See id.* § 3503.29(F). Any person within this definition (*cf. id.* § 3503.29(E)), in turn, is required, each year prior to "registering voters," to satisfy a host of requirements. An individual must register with state, complete training, disclose for whom he is working and other personal information including address and birthday and declare in writing that "I will follow all applicable laws of Ohio while registering voters" (which laws

are vague, as set forth below). *See id.* § 3503.29(C). The individual must conduct the required training via the Internet, and has no other option if he or she does not have access to a computer. The voter registration form itself, as required by section 3503.14(A)(6), requires persons paid to register voters to sign the voter registration form and include their name, address, and the name of their employer

The Ohio voter registration worker registration, training, and disclosure requirements go well beyond controlling "the mechanics of the electoral process"; rather, they directly burden core political speech. *See Buckley v. American Const. Law Found., Inc.*, 525 U.S. 182, 204 (1999) (paid circulator disclosure requirements regulate speech); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345-346 (1995) (Ohio election law disclosure requirements regulate speech, not electoral process); *American Const. Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1104-05 (10th Cir. 1997) ("[C]ompelling the disclosure of the identities of every paid circulator chills paid circulation, a constitutionally protected exercise"); *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) ("Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from becoming registrars impair their ability effectively to organize and make their voices heard."). Ohio's registration, training, and disclosure provisions are a direct imposition on Plaintiff's' First Amendment freedoms and require strict scrutiny.

The constitutional injury occasioned by forced registration, training, and disclosure is compounded by the law's selective application. Not everyone who distributes a voter registration application is covered. By its terms, Section 3503.29 requires registration, training, and disclosure by only paid workers. *Compare* Ohio Rev. Code § 3503.29(C) *with* §§ 3503.29(E) & (F). The sponsors of the legislation had in mind which organizations they wanted to restrict. Indeed, in introducing the Senate's proposed changes to H.B. 3, Senator Coughlin, the Senate sponsor, stated, "The Senate bill includes other important fraud protections of note, including: … key protections for the disabled, senior citizens and home-

bound Ohioans [*i.e.*, those needing assistance in registering to vote] to ensure that they receive unbiased assistance in fulfilling their right to be heard through the ballot." *See* Intro. Of Senate Substitute to House Bill 3, Sen. Coughlin, Dec. 6, 2005.  He added, on the Senate floor, that the legislation was enacted, in part, because in 2004, "special interests came from out of state, willing to stop at nothing to affect the results of the election, even if it meant gaming the system through false registrations."[1]  *See* 12/13/05 Senate transcript.  The legislature made a conscious choice to limit regulation to certain organizations and their employees.  That choice lacks a constitutionally sufficient foundation.

Just as in *Buckley*, the Ohio regulations do not target all persons who register voters, but only those who are compensated for doing so.  *Cf.* 525 U.S. at 204, n.24.  Indeed, they apply to any person who is compensated for merely handing out voter registration forms.  *See* Ohio Rev. Code § 3503.29(F).  Moreover, the Ohio legislators were made well aware by groups engaged in compensated voter registration activities – before passing the bill – that the proposed provisions of Section 3503.29(C) would have a detrimental effect on voter registration in Ohio and would single out their efforts without justification.

The registration, training, and disclosure provisions of Ohio Rev. Code § 3503.29 impermissibly target speech and association without being narrowly tailored to serve their stated purpose – *i.e.*, to curb voter fraud.  *See* Intro. Of Senate Substitute to House Bill 3, Sen. Coughlin, Dec. 6, 2005 ("Preventing fraud" section discusses alleged fraudulent registration); *see Odle v. Decatur County*, 421 F.3d 386, 399 (6th Cir. 2004) ("the ordinance at issue here 'makes no attempt to regulate only those expressive activities associated with

---

[1] The First Amendment does not permit a state to prevent association for political purposes by enacting barriers to political participation.  "Similarly, the freedom of political belief and association guaranteed by the First Amendment prevents the State, absent a compelling interest, from penalizing citizens because of their participation in the electoral process, their association with a political party, or their expression of political views."  League of United Latin American Citizens v. Perry (2006), 548 U.S. _____ (internal quotations omitted).

harmful secondary effects and includes no limiting provisions.  Instead, [it] sweeps within its ambit expressive conduct not generally associated with' the kinds of harmful secondary effects it was designed to prevent.").

The Supreme Court has rejected as overbroad regulations that curb political speech for the alleged purpose of abating voter fraud.  *See e.g., Buckley*, 525 U.S. at 204 ("Listing paid circulators and their income from circulation forces paid circulators to surrender the anonymity enjoyed by their volunteer counterparts; no more than tenuously related to the substantial interests disclosure serves, Colorado's reporting requirements, to the extent that they target paid circulators, fail exacting scrutiny.") (internal citations omitted); *Meyer*, 486 U.S. at 425-427 ("We are not prepared to assume that a professional circulator--whose qualifications for similar future assignments may well depend on a reputation for competence and integrity--is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot…. [T]he risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (percentage limitation on charity expense allocations too imprecise to help prevent fraud where "no necessary connection" between fraud and high solicitation and administrative costs).

The Ohio legislature had no reason to believe that these requirements – which apply only to paid voter registration workers, and not volunteers – would curb voter fraud.  The Greater Cleveland Voting Coalition submitted data supporting the lack of voter fraud.  *See* Testimony of Greater Cleveland Voting Coalition, June 14, 2005.  The data revealed not one case of documented voter fraud brought to the Ohio Courts of Appeals from 2000 to the present, despite over 8 million votes cast in the 2000 and 2002 Ohio general elections.  *Id.* The analysis estimated from actual data that "the number of proven (once investigated and completed) voter registration fraud cases for the 2004 election will be between 5 and 10.

This must be seen in context:  Over 750,000 new registrations were submitted statewide in 2004."  *Id.*  The Coalition showed that "based on telephone calls to all 88 county Boards of Elections, also found no cases of actual voters using fraudulent registrations to attempt to vote.  In sum, our present system works well to correct a minimal number of registration violations…."  *Id.*  There is nothing in the legislative record that singling out groups that employ voter registration workers would diminish fraud.  In fact, it is doubtful that any law could prevent the isolated instances of fraud that serve as the only basis for this legislation.

The State has no evidence that these provisions are narrowly drafted in a way to curb voter fraud.  *Cf. Buckley*, 525 U.S. at 203 ("The added benefit of revealing the names of paid circulators and amounts paid to each circulator, the lower courts fairly determined from the record as a whole, is hardly apparent and has not been demonstrated."); *Secretary of State v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 967 (1984) ("[I]f an organization indulges in fraud, there is nothing in the percentage limitation that prevents it from misdirecting funds.  In either event, the percentage limitation, though restricting solicitation costs, will have done nothing to prevent fraud.").  In fact, the regulations require registration, training, and disclosure for any individual who simply distributes voter registration forms, regardless of whether the distributor engages in any other voter registration activity.  *See* Ohio Rev. Code § 3503.29(F).  That any such requirement could serve to limit voter fraud strains credulity.  The absurdity of these requirements is further demonstrated by its limitation to just paid voter registration workers.  *See Buckley*, 525 U.S. at 203-204.

The lack of a definition of "compensated" only adds to the constitutional infirmity.[2]  State Senator Kimberly Zurz, a member of the Joint Committee on Agency Rule Review,

---

[2] Originally, the rules issued by the Secretary of State included a definition of "compensation" as "a payment or gift of any amount."  *See* O.A.C. 111-12-02 (filed May 5, 2006).  When the rules were reissued after complaints, this overbroad definition was omitted, but no alternate definition was included.  *See* O.A.C. 111-12-02 (filed June 14, 2006).

stated, "Compensation is going to have to be decided on a case-by-case basis." J. Provance, "Panel Supports Blackwell on Voter Registration Rules," (*Toledo Blade*, June 27, 2006, *attached as* Exhibit N). Thus, it is uncertain whether a person who is paid primarily to perform other duties would be covered if in the performance of those other duties he for example distributed voter registration forms. For example, a candidate committee's employee who gave a voter registration form to a voter in response to a request may be deemed to be one who "receives compensation for registering a voter." Similarly, as the League of Women Voters of Ohio noted, volunteers who receive transportation, food or beverage, or campaign trinkets may fall under the jurisdiction of the statute. *See id.* Ordinary citizens are left to wonder whether they are violating the law by not registering with the State and undergoing training before they hand their neighbor a voter registration card.

Section 3503.29(C) unfairly burdens the First Amendment rights of paid voter registration workers without any tailoring to serve the state interest at issue. *Cf. McIntyre*, 514 U.S. at 349-350 (Ohio's "Election Code includes detailed and specific prohibitions against making or disseminating false statements during political campaigns. Ohio Rev. Code Ann. §§ 3599.09.1(B), 3599.09.2(B) (1988). . . . Thus, Ohio's prohibition of anonymous leaflets plainly is not its principal weapon against fraud [and do not] . . . justify § 3599.09(A)'s extremely broad prohibition"). Ohio's law is a blunt weapon against a type of fraud that requires a scalpel. Accordingly, it is unconstitutionally overbroad and must be stricken.

> **3. Ohio Rev. Code §§ 3503.19(B)(2)(b) and (c), 3599.11(B)(2)(a) and (C)(2) Require Voter Workers To "Return" Voter Registration Forms To Particular Places in a Particular Manner Subject To Criminal Penalties, But Do Not Specify Acceptable Methods For Doing So, And Are Therefore Unconstitutionally Vague.**

Ohio Rev. Code §§ 3599.11(B)(2)(a) and (C)(2) and §§ 3503.19(B)(2)(b) and (c) are unconstitutionally vague. They criminalize conduct by anyone who receives compensation

for "knowingly return[ing] any registration form entrusted to" them "to any location other than any board of elections or the office of the secretary of state."  *See* Ohio Rev. Code §§ 3599.11(B)(2)(a) and (C)(2); *see also id.* §§ 3503.19(B)(2)(b) and (c) ("shall return").  It seems likely that the Ohio legislature meant, by these sections, to differentiate between the myriad locations to which entrusted persons, as opposed to applicants themselves, could "return" their registration forms.  The Code does not provide, however, any guidance for reasonable persons "registering voters" to determine how  to return a form without committing a felony – *i.e.*, whether such "return" must be in person, or whether they may do so by mail, by courier or, in turn, through the organizations for which they work.  *See id.*

On several occasions, Plaintiffs have sought guidance from the Ohio Attorney General and Ohio Secretary of State as to whether its regular practices – of first submitting registration forms to the organization for review and processing, and promptly mailing in the forms[3] – would violate the new law.  Notwithstanding Plaintiffs' efforts, the state has failed to provide the guidance that would allow Plaintiffs' to confidently determine whether they are acting in compliance with the law.  This lack of clarity has caused plaintiff's employees to curtail their registration activities, as they have been unwilling to sign affirmations that they have complied with the Ohio law that they do not understand.  This is precisely the type of vague regulation that violates the fundamental notion of due process.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. . . .  [W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "Close examination of the specificity of the statutory

---

[3] These procedures actually assist the state by identifying deficient and potentially fraudulent applications and in doing so they free the state from having to reject the application and notifying the applicant.  As a result, more citizens are registered, more potential fraud is discovered and fewer provisional ballots are cast.

limitation is required where, as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests." *Buckley v. Valeo*, 424 U.S. 1, 40-41 (1976). "The test is whether the language of [the statute] affords the '(p)recision of regulation (that) must be the touchstone in an area so closely touching our most precious freedoms.'" *Id.* at 41 (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

Statutes which clearly prohibit some activities can still be void for vagueness. *See e.g., City of Chicago v. Morales*, 527 U.S. 41, 56-57, 60 (1999) ("[T]he vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not"); *Hynes v. Borough of Oradell*, 425 U.S. 610, 620-623 (1976); *United States v. Salisbury*, 983 F.2d 1369, 1377-1379 (6th Cir. 1993); *Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1399 (6th Cir. 1987).

Ohio Rev. Code Section 3503.19(B)(2) sets forth the requirements for the "return" of completed voter registration forms. It specifies that an applicant: "may return [his] completed registration form in person or by mail to [a number of specified locations]", Ohio Rev. Code § 3503.19(B)(2)(a), or "may return [such form] through another person [to fewer locations]," *id.* § 3503(B)(2)(b). In contrast, it requires that paid voter registration workers "shall return any form entrusted to that person by an applicant to [those fewer locations]."[4] *Id.* § 3503(B)(2)(c). Unlike the provisions for applicants, paid voter registrars receive no guidance as to how they may return the forms. *Cf. Hynes*, 425 U.S. at 622-623 ("he is not told what must be set forth in the notice, or what the police will consider sufficient as

---

[4] It is unclear why the statute singles out compensated voter registrars, and makes no provision for volunteer voter registrars who have been entrusted with voter registration forms. Evidently, in targeting the political speech of voter registration drive organizations, the Ohio legislature overlooked this other group.

"identification." This is in marked contrast to Ordinance No. 573 which sets out specifically what is required of commercial solicitors").

The affirmation form created by Ohio's Secretary of State, which paid voter registration workers must submit with each batch of completed registrations (§ 3503.29), compounds the uncertainty.  It requires the affiant to swear "I will return any properly completed registration form … to a county board of elections or the secretary of state's office, and not to any other person, group, organization or entity."  *See* (Ohio Affirmation form, *attached as* Exhibit O (emphasis added)).  It is unclear from this affirmation whether passing on completed registration forms to one's employer for quality control checks, or even to couriers or messenger services, constitutes a violation of law.  Despite this uncertainty, the Ohio Revised Code makes it a felony for any voter registration worker, paid or unpaid, to "knowingly fail" to do so.  *See id.* §§ 3599.11(B)(2)(b) and (C)(2).

Adding to the confusion, Section 3503.29(D) refers to the affirmation that paid voter registration workers must "submit" with completed voter registration forms, and that a single affirmation "may be submitted with all voter registration forms that are returned by that person at one time."  *Id.* § 3503.29(D).  Proposed rules enacted to clarify sections 3503.28 and 3503.29 also include in the definition of "returning" the delivery of voter registration forms to "the United States postal service."  *See* 111-12-02 (filed June 14, 2006).

It is unclear from the statute whether voter registration workers must "return" the forms in person, or whether they may pass on completed voter registration forms to their employers for internal review and processing, *i.e.*, data collection; quality control checks; tracking of worker performance; to then be submitted by the organization to the proper government offices.  Read one way the statute regulates only where the form is to be returned.  Read another way it regulates who must actually physically return the form.  If it is understood to regulate the latter, it would still fail to inform the public who must return the form when the registration is the result of a collective effort, for example, a voter registration

drive at a community event where various individuals will man a table during the course of a day. The statute is unclear as to what conduct it regulates and who is legally responsible for compliance. It is from this inherent vagueness of the statute that plaintiffs rightly seek relief.

Plaintiffs sought guidance from Ohio state authorities as to whether their registration practices would comply with the new law, but Ohio State officials steadfastly have provided no guidance. First in April and then again in May and June, Plaintiffs sought guidance from the Ohio Attorney General and Ohio Secretary of State as to whether these methods of handling voter registration forms would comply with the new laws. The Attorney General answered, "we are not in a position to give you any of the assurances that you seek regarding whether your client's conduct would be in conformity with Ohio Rev. Code § 3599.11(C)(3) [sic]." (Letter from Petro). The Secretary of State's Office has refused to respond to Plaintiffs' letters and phone messages. (Givens Aff. ¶ 9).

No court has construed the terms of this brand new law. Nor do the other portions of the Ohio Revised Code regarding election laws provide any guidance. Section 3503.16(a) provides that "Any voter registration…, returned by mail, may be sent only to the secretary of state or the board of elections," but does not clarify whether this section means that organizations may return forms by mail within the meanings of §§ 3503.19(B)(2)(c) or 3599.11(C)(2) on behalf of their workers. *Cf. Hynes*, 425 U.S. at 622-23 (noting that the vagueness of one law was in "in marked contrast" to the specificity of a related one). Other sections that are similarly vague, but which do not carry penalties for failure to comply, also provide for the "return" of materials, including §§ 3501.11(K) (requiring boards of elections to "return" petitions and nomination papers to the secretary of state), 3501.30 (requiring that election supplies "shall be returned" by polling places to the boards of elections), and 3503.16(F) (election officials "shall return" completed change of name forms with pollbooks and tally sheets to boards of elections). Each of these provisions directs someone to return election materials but does not mandate how the return is to be accomplished.

For example, it is unlikely that Ohio law would be read to require members of the board of elections to personally return petitions and nomination papers to the secretary of state.  The means by which the duty of return is to be accomplished is not specified and it is left to those charged with the responsibility to select a means reasonably calculated to achieve the result.  This is how Plaintiffs believe §§ 3503.19(B)(2)(b), (c) and 3599.11(B)(2)(b) and (C)(2) are properly read.  It is also apparently how the bill's author Representative Kevin DeWine intended these provisions to be read.[5] It is because neither the Secretary of State nor the Attorney General will inform Plaintiffs that this is how they read these provisions or to otherwise clarify the law that Plaintiffs find it necessary to seek judicial relief.

If Defendants were to interpret these provisions to require anything other than that completed voter registration forms collected by third-party voter registration groups are to be ultimately returned to the boards of elections or to the office of the Secretary of State, the result would be to severely and unconstitutionally burden Plaintiffs' speech and associational activities in helping others register to vote.  Plaintiffs would be directly prohibited from their chosen method of association to assist others to register to vote, as they would not be able to associate to review and return forms, but instead would be required to individually collect and return forms.  Additionally, such a rule, by making impossible the review of applications for completeness and accuracy, would substantially impede plaintiffs' activities and severely burden their speech and association in convincing others to register and vote.  Such an

---

[5] In an article written by John McCarthy of the Associated Press and appearing in the June 6th edition of the *Akron Beacon Journal,* Rep. DeWine is quoted in regard to this requirement as saying "What we didn't want was for that person to submit a large stack of registrations to the Bureau of Motor Vehicles or a school." (J. McCarthy, "Voter Registration Groups Say New Rules Confusing, *Akron Beackon Journal*, June 5, 2006, *attached as* Exhibit P).  In June 6th edition of the *Toledo Blade,* Jim Provance reports Rep. DeWine as saying "The only thing that we cared about is if someone signs a registration form that that form get to the board within 10 days. ….What happens in between is not important to me." (J. Provance, "Critic Rip Rules for Paid Staffers Signing Up Voters," *Toledo Blade*, June 6, 2006, *attached as* Exhibit Q).

interpretation would therefore be an independent violation of the First Amendment, *see, e.g.*, *Meyers*, 525 U.S. at 187; *Meyer v. Grant*, 486 U.S. 414, 422-25 (1988), even though Plaintiffs maintain the vagueness of the provision precludes Ohio from adopting this interpretation.  The possibility that the law could be applied in this way chills plaintiffs' speech and association and militates in favor of its invalidation.

The vague provisions of §§ 3503.19(B)(2)(b), (c) and 3599.11(B)(2)(b) and (C)(2) have caused Plaintiffs' organizations to suspend or curtail their registration activities, to "steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'"  *See Grayned*, 408 U.S. at 108-109.  They do not give persons of "ordinary intelligence a reasonable opportunity to know what is prohibited," so they "may act accordingly." *See id.*  Indeed, just as in *Hynes*, a voter registrar "who used the mail might well find too late that the identification he provided by mail was inadequate," 425 U.S. at 622-623, or worse, felonious.  Therefore, the provisions are unconstitutionally vague and should be held void on their face.

### 4.  NVRA Claims

Sections 3503.14, 3503.19, 3509.29 and 3599.11 of the Ohio Revised Code overtly violate NVRA in three respects.  First, these provisions violate the NVRA because they limit a federally mandated method of registration—postcard registration—and second, they re-impose a form of deputy registration that the NVRA sought to eliminate.  Lastly Ohio law requires the promulgation of a voter registration form that does not comply with the requirements of the NVRA.  In doing so Ohio law violates the NVRA and frustrates its legislative purpose, which is to augment and liberalize voter registration procedures to the greatest extent possible while protecting the integrity of elections.

Because Plaintiffs also bring a claim under 42 U.S.C. § 1983, notice is not required. *Ass'n of Community Org. for Reform Now v. Miller*, 912 F. Supp. 976, 983 (W.D. Mich. 1995), *aff'd* 129 F. 3d 833 (6th Cir. 1997); *see also Condon v. Reno*, 913 F. Supp. 946, 960

(D.S.C. 1995) (when plaintiffs were "also exercising their rights under 42 U.S.C. § 1983," their NVRA claim was not barred). Moreover, to wait longer before filing would be futile; defendants have made it abundantly clear that they will continue to refuse to comply, such that their noncompliance is thus intentional, and not the result of an administrative oversight *See Miller*, 912 F. Supp. at 983 .

**a) The NVRA Preempts Ohio Law to the Extent that It Impedes a Form of Registration Mandated by the NVRA**

In *Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 324 F. Supp. 2d 1358, 1362 (N.D. Ga. 2004), the Wesley Foundation, a charitable organization that conducts voter registration drives, brought a claim against the State of Georgia, alleging violations of their rights under the NVRA. *Id.* The Foundation had collected sixty-four forms and mailed them in a single package to the Secretary of State's office for processing. The Secretary's office rejected the forms because it interpreted Georgia law to prohibit anyone but registrars, deputy registrar or otherwise authorized persons from accepting or collecting voter registration forms. *Id.* at 1361. Since no authorized person had participated in the voter registration drive, the Secretary's office rejected the mailed applications. *Id.* On appeal, the State of Georgia argued that NRVA did not sanction private voter registrations drives as a mode of registration. Georgia contended that the NVRA did not regulate the method of delivery of voter registration forms and thus insisted on each individual registration form being separately mailed in by the applicant. *Charles H. Wesley Educ. Found.*, 408 F.3d at 1353. The Eleventh Circuit rejected Georgia's argument. "By requiring the states to accept mail-in forms, the Act does regulate the method of delivery, and by so doing overrides state law inconsistent with its mandates." *Id.* at 1354. The court further made it clear that NVRA

required the Secretary of State to accept and process valid registration forms that were delivered by mail and postmarked in time to meet the deadline. *Id.*

The Eleventh Circuit further clarified that NVRA does not prohibit or regulate voter registration drives, but rather protects them. *Id.* at 1353.  The court reasoned that Congress's instruction in NVRA, 42 U.S.C. § 1973gg-4 (a)(1)-(2), directing states to make Federal registration forms available, especially to organized voter registration programs, implied that NVRA protected voter registration drives. This manifested Congress' recognition that private organizations would be conducting voter registration drives, collecting and returning voter registration forms, and thus lends support to the notion that Congress, via NVRA, meant to facilitate these efforts. The court noted:  "Nowhere does the NVRA prohibit or regulate voter registration drives; rather, it impliedly encourages them. . . .  Thus the Act does not prohibit registration drives, but because it limits the states' ability to reject forms meeting its standards (which privately collected, mailed forms would do) it does protect them." *Id.*

The court observed that private voter registration drives are not a "mode" of registration, but rather a "method" by which private parties may facilitate the use of the "mode" of registration by mail, which the NVRA sanctions.  *Id.*  Thus, Georgia's requirement that each individual applicant separately mail in their registration form, instead of bundling the forms, was rejected by the court because it undermined a mode of registration that NVRA sought to protect.  Since Georgia's law was inconsistent with the NVRA, the court held that the NVRA preempted the Georgia law. *Id.* at 1354.

In this case, Ohio's law has the same effect as Georgia's anti-bundling policy in the *Wesley* case. By imposing restrictions on the manner on which registration forms are returned to the board of elections or Secretary of State's office, Ohio Rev. Code §§ 3509.29 and

3599.11 would impede a mode of voter registration protected by the NVRA. To the extent that Ohio Rev. Code § 3599.11 is understood to require third-party registration workers to return completed voter registration forms personally to a board of elections or Secretary of State and makes it a fifth degree felony to violate this provision, it runs afoul of NVRA. NVRA encourages and protects the use of the mail registration form and preempts any state law that unreasonably encumbers its use. Should Ohio law be read to limit the ability of organizations to use the mail voter registration form it would be preempted.

Requiring voter registration workers to personally return voter registration applications to the Secretary of State or a board of election would be precisely such an encumbrance. It would decrease the effectiveness, increase the costs and impair Plaintiffs' ability to use the form. The role of postcard registration would be severely diminished; its efficacy seriously compromised. Therefore, Ohio Rev. Code § 3599.11 would contravene the NVRA's purpose and thus, like the Georgia regulation in *Wesley*, would be preempted. *Wesley*, 408 F.3d 1349. *See also Gade v. Nat'l Solid Wastes Management Ass'n*, 505 U.S. 88, 105 (1992) (holding that state law which "substantially impedes [and] frustrates [a]federal regulation," should be preempted).

Why Congress required postcard registration is clear. Congress concluded that it should "assist in reducing barriers, particularly government-imposed barriers, to applying for registration wherever possible." H.R. Rep. No. 103-9, at 3, *reprinted in* 1993 U.S.C.C.A.N. 105. The NVRA was enacted in response to a finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office, and disproportionately harm voter participation by various groups, including the disabled and racial minorities." *Id.*; S. Rep. No. 103-6, at 2. As a

result, the NVRA sought to assure that voters would not be totally dependent on government efforts to register voters.  To this end, it required that the States accept postcard registrations and to make those forms "available for distribution through governmental and private entities, with particular emphasis on making them available for organized voter registration programs."  42 U.S.C. § 1973gg-4(b).  In doing so, the NVRA empowered private entities to fill the gap by reaching out to assist those who government may miss.  This is what Plaintiffs do and the success of their efforts demonstrates why Congress chose to facilitate their programs by requiring States to accept the postcard registrations that they returned.

The NVRA does not limit how a voter may choose to return his voter registration application.  To the contrary it required states to enroll any eligible person whose application is timely received.  42 U.S.C. § 1973gg-6.  Additionally, the NVRA expressly requires each state to "accept and use the voter registration application for prescribed by the Federal Election Commission," and any equivalent state form, regardless of the manner in which it is returned. 42 U.S.C. § 1973gg-2(a)(2); § 1973gg-4 (a) (1).  Moreover, given the NVRA's express purpose of increasing voter registration opportunities for qualified citizens to the greatest extent, state regulation which attempts to impede or diminish the use of postcard registration will frustrate the NVRA's purpose. This is precisely what the Ohio law would do if it is understood to limit how vote registration applications are returned

Should Ohio impose a requirement that persons collecting voter registration applications personally deliver them to a board of elections or to the Secretary of State, it would be imposing a significant impediment to postcard registration - a mode of registration protected by the NVRA.  Ohio is acting consistent with the NVRA when it instructs the public where (i.e. what state office) completed voter registration applications are to be

delivered.  By doing so, Ohio assures that voters are timely placed on the rolls.  No purpose consistent with the NVRA, however, is served if Ohio goes beyond that and strictly regulates how delivery is to be accomplished.  Requiring individuals who collect completed voter registration applications to personally deliver them to an election board or the Secretary of State would defeat the NVRA's purpose in making postcard registration universally available and accepted.  It would limit the opportunity of Ohio citizens to take advantage of postcard registration and it would have the greatest impact on those citizens most in need of it, the poor, the elderly, the disabled and traditionally underrepresented minorities.  Since the effect of an overly strict reading Ohio's law would be to impede the use of postcard registration, the Ohio law would be preempted. 42 U.S.C. § 1973gg-2 (a).

**b)  Ohio Law Limits the Ability of Private Organizations to Conduct Voter Registration Drives in Violation of NVRA**

In addition to impeding a mode of registration mandated by the NVRA, Ohio limits the ability of private organizations to engage in voter registration.  Ohio Rev. Code § 3503.29(C) requires compensated voter registration workers to fulfill certain prerequisites *before* registering any voter.  These requirements include (1) registering with the Secretary of States, (2) completing the training program established by the Secretary of State pursuant to § 3503.29 (A), (3) signing a statement of affirmation, and (4) returning the signed registration form and statement of affirmation to the Secretary of State's Office.  All this must be done *prior* to even handing an application to a voter. Ohio Rev. Code § 3503.29 (C).  This law makes it more difficult to help register voters.  Since Congress' primary purpose in enacting the NVRA was to liberalize voter registration procedures in order to substantially

-31-

increase voter registration (42 U.S.C. § 1973gg (b) (1)), a law that imposes a plethora of requirements that circumscribe the ability of organizations to conduct voter registration drives aimed at increasing voter registration and participation in the federal election process, frustrates the NVRA's legislative purpose.

Neither Congress nor the EAC imposes restrictions on the use and acceptance of the mail registration form. In fact, current NVRA regulations reinforce the view that private voter registration drives using the federal form or its equivalent are to be fostered under the NVRA. *See Wesley Foundation*, 408 F.3d at 1353. The NVRA does not impose prerequisites for distributing forms rather it requires forms to be made widely available and it compels States to accept timely registration forms regardless of how and by whom they are transmitted. 42 U.S.C. § 1973gg-6. Consequently, Ohio Rev. Code § 3503.29(C), by qualifying who may distribute, collect and return voter registration applications constructs a voter registration system that is at odds with Congress's intent. It substitutes the State's judgment for that of Congress.

The NVRA allows voters to self register. No longer are voters required to visit a state office or appear before a deputy registrar. To further free the voter, the NVRA prohibits states from requiring a voter to have her application notarized or authenticated. Congress determined that any speculative reduction in fraud that was occasioned by such restrictions was outweighed by their detrimental impact on participation particularly in communities that were underrepresented in our democracy. Consequently, the NVRA empowers citizens to register with a postcard provided by an organized group and returned to the proper office. The NVRA removes any state imposed constraints on this simple process. Ohio cannot limit that freedom.

In summary, Congress, in enacting the NVRA, sought to free voters and organized voter registration programs from a patchwork of often "discriminatory and unfair registration laws and procedures" that diminished participation.  42 U.S.C. 1973gg-2.  The State of Ohio erecting precisely the type of barrier to participation that NVRA sought to eliminate. Congress recognized the important role organized voter registration agencies have historically played in our country.  It sought to protect and expand that role by requiring states to make voter registration forms available to private voter registration programs. 42 U.S.C. 1973gg-4 (b).  It then required states to accept those forms if they were timely returned.  42 U.S.C. 1973gg-6.  By unreasonably regulating the distribution, collection or return by organized voter registration drives, the State of Ohio would significantly burden a right created by Congress in NVRA, 42 U.S.C. § 1973gg-4 and frustrate the very purpose of NVRA.

> **c)  The Mandatory Training and Registration Requirements of Ohio Law Are a Form of Deputy Registration in Violation of the NVRA**

The training and registration provisions compound the NVRA violation.  Where the return provisions impede the use of the mail registration form mandated by the NVRA, the training and registration resurrect deputy registration that the NVRA sought to eliminate. Prior to the passage of the NVRA, various states limited who could register voters.  A primary objective of NVRA was to do away with these restrictions.  *See* H.R. Rep. No. 103-9, at 30 ("Almost all states report that they have some form of agency or satellite registration, which in some states means a voter has to swear an oath in front of a deputy registrar at one of several county offices. H.R. 2 envisions a somewhat expanded type of agency registration

in which forms are available at a variety of locations where voters can complete and submit them (or else take them home and mail them in)."); *see also* S. Rep. 103-6, at 45-46 (containing an almost identical description).

Under the NVRA, any voter may complete the mandated voter registration form and if the voter desires assistance, she can receive it from a person of her choosing.  The NVRA vests in the voter the ability to self-register, and a state can only reject the registration if it lacks the necessary information or the state determines that the voter is ineligible.  42 U.S.C. 1973gg-6.  The training and registration provisions diminish the right and opportunity to self-register and recreate a system of state deputization that Congress sought to supplant in passing the NVRA.  Under Ohio law a voter's ability to obtain a form, to accept assistance in completing it or to return it again becomes subject to the vagaries of state law.

Ohio Rev. Code § 3503.29 (C) imposes unique requirements on organizations and those they pay for assisting voters in registering.  In doing so it impinges on rights protected by the NVRA.  It unjustifiably requires more of groups that pay workers to achieve the NVRA's goals than of others.  All of its requirements including (1) registering online with the Secretary of State; (2) completing the online training program established by the Secretary of State pursuant to § 3503.29 (A); and (3) signing a statement of affirmation must be satisfied *prior* to an individual even handing a voter registration form to a voter.  Ohio Rev. Code § 3503.29(C).  As a consequence of these requirements, applications will not be as widely available, less assistance will be offered and fewer citizens will be registered. These requirements are no more than a form of deputy registration except they apply only to paid workers.  Ohio in enacting these requirements places the same type of hurdle on vote registration that Congress sought to remove.

-35-

Plaintiffs would not compensate workers to register voters unless it was the best means available to get through to hard-to-reach voters.  It is how Plaintiffs choose to achieve what Congress intended.  Plaintiffs concentrate their efforts on helping to register those citizens that NVRA makes special effort to bring into the process.  By hampering Plaintiffs' efforts and greatly increasing the costs of paid voter registration drives, these provisions of the Ohio law frustrate the NVRA's purpose, which is to augment and liberalize voter registration procedures to the greatest extent, in order to encourage increased participation in the Federal electoral process of those that have traditionally been underrepresented.  It was efforts like Plaintiffs that Congress was endorsing in passing the NVRA.

The effect of the Ohio law is to undermine the NVRA by limiting postcard registration, burdening private voter registration efforts and resurrecting a form of deputy registration.  In doing so Ohio law imposes a significant burden on federally created rights and thwarts the NVRA's purpose of increasing the opportunity of all citizens to register.  Since the Ohio law "substantially impedes [and] frustrates" this federal statute (NVRA), it "must yield, no matter how admirable." *Gade*, 505 U.S. at 105.

### d)  NVRA Forbids Ohio's Voter Registration Form
### Question 15

Ohio Revised Code § 3503.14(A) explicitly requires that the registration form prescribed by the Secretary of State "shall include a space on which the person registering an applicant shall sign the person's name and provide the person's address and a space on which the person registering an applicant shall name the employer who is employing that person to register the applicant."  The term "'registering an application' includes any effort, for compensation, to provide voter registration forms or to assist persons in completing or returning those forms."  *Id.* § 3503.14(E).  The requirement that a person assisting an

applicant to register must sign the form and list their employer was part of state law prior to the passage of H.B. 3 (though the voter registration form was only modified in 2006 to request the name of the voter registration worker's employer); the new legislation added the requirement that the person's address also be listed.  Pursuant to section 3503.14, the Secretary of State has promulgated a voter registration form that requires any person who "registers" a voter for compensation to disclose this additional information on any form that he distributes, assists with or returns.

In the NVRA Congress delegated to a federal agency the responsibility of determining, after consultation with the chief election officers of the States, the contents of the mail voter registration form.[6]  42 U.S.C. § 1973gg-7(a).  The NVRA expressly limits the amount of information that the voter registration form created by the FEC and now the EAC and any equivalent state form may request.  Section 9(a)(4)(b)(1) of the NVRA states, "The mail voter registration form …(1) may require *only* such information (including the signature of the applicant) and other information…as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process…"  42 U.S.C. §1973gg-7(a)(4)(b)(1) (emphasis added).

Following this directive, the EAC has determined what information may be requested on a mail registration form. 42 U.S.C. § 1973gg-4(a)(1) ("Each State shall accept and use the mail voter registration application form prescribed by the Federal Election Commission").  Courts give "considerable weight" to "an executive department's construction of a statutory

---

[6] The Federal Electoral Commission (FEC) was originally charged with the duty of enforcing the NVRA.  However, pursuant to the passage of the Help America Vote Act of 2002, the FEC's responsibilities under the NVRA were transferred to the EAC, as of March 29, 2003.  42 U.S.C. §§ 15532, 15323(a)(4).  *See also* 42 U.S.C. 1973gg-7(a).  At present, the FEC and EAC still share administration duties under the NVRA and thus current regulations under NRVA are still generated by the FEC.

scheme it is entrusted to administer." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). The EAC is charged with developing a federal voter registration form that meets the requirements of NVRA and is to serve as the model for any state form. 42 U.S.C. § 1973gg-7. The federal form represents the EAC's reasoned construction of what a NVRA-compliant voter registration form should contain, and such construction must be given considerable weight.

Congress invested in the EAC the responsibility to identify after consultation with the states what information is necessary to register. The evident purpose was to remove from voter registration applications information that was extraneous or unnecessary in determining the eligibility of the registrant. The goal was to simplify the form, to remove confusion, to protect privacy and in doing so to foster registration. Congress's desire to protect a registrant's privacy is particularly relevant. In order to protect a citizen's privacy, the NVRA expressly prohibits the disclosure of the agency through which a voter is registered. 42 U.S.C. § 1973gg-6(a)(6). It is inconceivable that Congress would have intended a federal agency or a state government to undercut this protection by permitting a state to use a form that would erode a citizen's privacy. Ohio forced disclosure on its voter registration form of the private organization that provides, assists, or returns a voter registration form invades the very privacy interest that Congress sought to protect.

In keeping with this legislative intent, the federal form contains spaces for the name, address, and date of birth of an applicant. An applicant may also list a political party and provide information about their race or ethnic group. The applicant must attest to the accuracy of the information as well as to the fact that she is at least 18 years of age, a United States citizen, and meets the other requirements for voting in her state (e.g.. no felony convictions or judgment of incapacity). Only if the applicant is unable to sign, is the person who helped the person fill out the application required to give his name and address. Nowhere on the form does it require identification of the person who provided or collected

the form or the disclosure of that person's employer.  Furthermore, only in the instance that the applicant is unable to sign does it require a person helping the applicant to give his name and address.  The federal registration form reflects what the EAC deems to be the information necessary to assess a person's eligibility to vote and to administer the election process.  This determination must be given considerable weight.  *See Chevron*, 467 U.S. at 844.

In summary, state mail registration forms may not request information in excess of that requested on the federal form.  *See* 42 U.S.C. § 1973gg-4(a)(2).  Since the EAC has determined what information may be requested, the State of Ohio, in creating a registration form that demands more information than that requested on the federal form, exceeds the State's authority under the NVRA.  42 U.S.C. §1973gg-4 (a)(2)(b).  The voter registration form created by Ohio's Secretary of State, pursuant to Ohio Rev Code § 3503.29(C), requires the disclosure of the name of the organization through which voters are registered.  By requesting this information, Ohio's voter registration form requires information beyond what federal law permits.  In mandating the disclosure of the name of the agency responsible for registering voters, question 15 of Ohio's registration form violates the  NVRA.

### 5.      The Forced Disclosure of Compensated Voter Registration Workers' Employers on the Voter Registration Form Violates the First Amendment

Citizens who wish to register to vote with the assistance of Plaintiffs' compensated voter registration workers face compelled disclosure of their association with Plaintiffs to the state.  This unconstitutionally burdens their right to association under the First Amendment.  "The fact that [Ohio has] taken no direct action [to] restrict the right of [Plaintiffs'] members to associate freely does not end inquiry to the effect of the" voter registration form.  *NAACP v. Alabama*, 357 U.S. 449, 461 (1958) (holding unconstitutional the forced disclosure of the names and addresses of NAACP's membership).  Rather, as the Supreme Court has made clear, "[i]n the domain of these indispensable liberties, whether of speech, press, or

association, the decisions of this Court recognize that abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action." *Id.*; *see also McIntyre*, 514 U.S. at 341-43 (recognizing First Amendment interest in nondisclosure of identity).

By forcing disclosure of the group that assisted an individual to register to vote, Ohio's law discourages association with these groups and abridges the rights of members who would otherwise register with the assistance of these third-party groups. This burden is particularly acute for certain members and constituents of the American Association of People with Disabilities, and those who are registered to vote by the AAPD and its partners; while these individuals may have difficulty registering to vote on their own, they are often particularly reluctant to identify themselves as "disabled" on a state document by submitting a voter registration form marked with the name of a disability advocacy group. By forcing these citizens to either disclose their association with these groups or to forego registering with the assistance of a third-party group, Ohio's law violates these citizens' right to association.

### C.  Plaintiffs Will Suffer Irreparable Injury

Because of the Ohio provisions of law and the Secretary of State's actions challenged here, Plaintiffs been forced to drastically cut back on its voter registration activities in Ohio and to divert substantial resources from its speech and association activities to comply with the new, onerous restrictions. The direct return provisions prevent Plaintiffs from conducting their voter registration drives in an effective and efficient manner. The registration and training requirements create an unnecessary hurdle to the voter registration process, one requiring both time and access to a computer and the internet, and one that will by necessity discourage some individuals from participating. And the voter registration form's request of additional information is both an invasion of privacy and an additional barrier to registering a

person to vote. These provisions conspire to all but eliminate Plaintiffs' ability to carry out their activities in Ohio.

As the 2006 election approaches, the time for registering voters is running out. Plaintiff organizations must decide now whether, and how, to conduct voter registration activities in Ohio. More importantly, for every day that goes by, plaintiff s lose the ability to register more and more voters before the 2006 election. Every day that Plaintiffs are restricted from their voter registration efforts results in a permanent and irreversible diminution in the number of registered voters in Ohio on Election Day.

For individuals in Ohio that have yet to register to vote, including some members of plaintiff organizations, the stakes are even higher: the ability to exercise their right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964).

### D. The Need for a Preliminary Injunction Outweighs Any Harm to Defendants

The third factor to be considered by this Court is whether injunctive relief would harm Defendants. Defendants cannot claim any harm in being enjoined from enforcing unconstitutional provisions. "[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001). And for the NVRA claims, Defendants also have no legitimate interest in enforcing voter registration laws that violate federal law and that were enacted to protect the franchise.

### E.  Injunctive Relief Is in the Public Interest

The final factor to be considered is the public interest.  "[T]he public has no interest in the enforcement of laws in an unconstitutional manner."  *L.P. Acquisition Co. v. Tyson*, 772 F.2d 201, 209 (6th Cir. 1985).  Moreover, NVRA was enacted specifically to protect the public's interest in having as many citizens as possible participate in federal elections.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Application for a Preliminary Injunction should be granted.

Respectfully submitted,

/s/ Donald J. McTigue

_____
Donald J. McTigue (OH 0022849)
*Trial Counsel*
Mark A. McGinnis (OH 0076275)
MCTIGUE LAW GROUP
886 North High Street
Columbus, OH 43214
Tel: (614) 263-7000
Fax: (614) 263-7078
mctiguelaw@rrohio.com

*Counsel for Plaintiffs*


Karl J. Sandstrom*
Ezra W. Reese*
PERKINS COIE LLP
607 14th Street NW
Suite 800
Washington, DC 20005
Tel: (202) 628-6600
Fax: (202) 434-1690
KSandstrom@perkinscoie.com

*Counsel for Association of Community Organizations for Reform Now, Project Vote, Common Cause and American Association of People with Disabilities*

Elliot M. Mincberg*
Devin Willis*
PEOPLE FOR THE AMERICAN WAY FOUNDATION
2000 M Street N.W. #400
Washington, D.C. 20036
Tel: (202) 467-4999
emincberg@pfaw.org

*Counsel for People For the American Way Foundation & Community of Faith Assemblies Church*


Brian Mellor (MA 43072)*
1486 Dorchester Avenue
Dorchester, Ma, 02122
TEL: (617) 282-3666
FAX: (617) 436-4878
ELECTIONSCOUNSEL1@PROJECTVOTE.ORG

*Counsel for Project Vote*


Wendy R. Weiser*
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Fl.
New York, NY 10013
Tel: (212) 998-6130
Fax: (212) 995-4550
Wendy.weiser@nyu.edu

*Of Counsel*

*\* Pro Hoc Vice Motions to Follow*

-43-

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was electronically filed this 13th day of July, 2006. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this through the Court's system.

/s/ Donald J. McTigue

_____

Donald J. McTigue, Attorney at Law