

607 Fourteenth Street N.W.
Washington, D.C. 20005-2011
PHONE: 202.628.6600
FAX: 202.434.1690
www.perkinscoie.com

May 5, 2006

Hon. J. Kenneth Blackwell
Secretary of State of Ohio
180 East Broad Street
Columbus, OH 43215

Ohio Attorney General Jim Petro
State Office Tower
30 E. Broad Street, 17th Floor
Columbus, OH 43215-3428

Dear Mr. Secretary and Mr. Attorney General:

As counsel to Project Vote and the Association of Community Organizations for Reform Now ("ACORN"), we are writing to you respectively the Chief Election Officer and the Chief Law Enforcement Officer of the State of Ohio to confirm that the methods employed by our clients to assist citizens in registering to vote remain legal notwithstanding recent changes in the election laws of Ohio. Our clients are dedicated to ensuring the full participation of poor and disadvantaged citizens in American civic life. A principle means by which our clients seek to accomplish this goal is to assist them in registering to vote. Our clients' efforts have proven to be very successful in Ohio. In 2004, more than one hundred thousand citizens, mostly poor and African-American, successfully registered to vote in Ohio with the assistance of our clients. Our clients hope to assist more than one hundred thousand Ohio citizens to register to vote this year.

The methods employed by our clients to assist citizens are detailed in the appendix A to this letter. Our clients use these methods because they have proven over time to be the most effective means of assisting their targeted population. ACORN follows the voter registration procedures outlined in Project Votes Policy Brief on Voting Registration (Appendix A). These procedures include:

1. Hiring workers from the communities where ACORN wants to increase registration,

2. Training the workers in the voter registration laws and how to complete applications,

3. Tracking, and often directing workers to, where they are conducting their registration activity,

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES
MENLO PARK · OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · WASHINGTON, D.C.
Perkins Coie LLP and Affiliates

May 6, 2006
Hon. J. Kenneth Blackwell
Ohio Attorney General Jim Petro
Page 2

4. Collecting all mail voter registration applications collected by a worker at the end of a shift,

5. Storing the mail voter registration applications in a secure place,

6. Visually inspecting every mail voter registration application for completion and/or errors,

7. Calling persons who have provided phone numbers on their mail voter application to confirm the information on the application,

8. Follow up with applicants who have errors on their applications or have not fully completed the applications to allow them to complete the application,

9. Recording the number of applications, the quality of applications and the results of the calls in order to track worker performance,

10. Delivering the applications directly to an election office on a regular basis, and

11. Flagging applications that are incomplete or have errors for Election Officials.

The procedures are similar, if not identical, to those that other organizations use.

Additionally, our clients conduct group or community registration programs where the organization sets up a table at an event and members sit at the table and provide mail voter registration applications to individuals who come to the table and collect them after the person has completed it. The same person who hands the application to the individual may not collect it once the application is completed. Over the day the individuals at the table may change. The organization collects all the applications at the end of the event and takes them to the election office after internal review and processing.

Our clients have learned through experience that a collective coordinated effort with a division of responsibilities is a hallmark of a successful program. For the reasons given below, our clients believe that the recent changes in Ohio election law do not impact their ability to continue to assist voters in the manner described. We request that you promptly inform us if our understanding is incorrect and the State of Ohio proscribes any of the practices detailed in Appendix A and described above.

Specifically our clients are concerned that state and local election officials may wrongly interpret recently enacted section 3599.11(C)(2) of the Ohio Revised Code. That section provides that "(N)o person who receives compensation for registering a voter shall knowingly return any registration form entrusted to that person to any location other than any board of election or the office of secretary of state." Our clients and the individuals that they employ to assist voters in registering are operating under the belief that they are in full compliance with this provision. Our clients' understanding of the law is set forth

May 6, 2006
Hon. J. Kenneth Blackwell
Ohio Attorney General Jim Petro
Page 3

in Appendix B in a letter of April 28, 2006 from Donald J. McTigue to Secretary of State Blackwell. Our clients return all voter registration applications that come into their possession to one of these two locations. The manner of transmittal may vary depending on the nature of the effort but all applications are timely returned to one or more of these locations.

The recent publication by the Secretary of State's office of a manual titled "Compensated Registrars Training" and a registration form for persons who are compensated for registering people to vote heightens our clients' concern that this provision may be misunderstood. Unfortunately those documents could be read to suggest that a person who assists a citizen in registering must return any completed applications in person to the appropriate office. Again our clients understand that the provision requires only that a person return a completed application to the appropriate office and do not govern the mode by which the return is accomplished.

It should be noted that our clients do not actually register individuals to vote but only assist them in exercising a federally protected constitutional and statutory right to register. Although this distinction may not matter for the purposes of state law, it is important in determining whether Ohio would be impairing a citizen's federally secured right to register to vote if it interpreted this provision of law more broadly and in doing so, limited the manner in which an application can be transmitted to an appropriate office. Our clients contend that any ambiguity in Ohio must be resolved in favor of enhancing rather than diminishing the ability of citizens to register. We assume that you as the state officials for interpreting and enforcing Ohio's election laws share our view of the proper construction of this provision of Ohio's election code. In the event that you do not, we assume that you will formally and promptly notify us.

Our clients, of course, do not want to suspend their registration programs pending a response. They consider these programs vital to the success of their mission of empowering the disadvantaged. Therefore they intend to make every effort to continue their programs to register disadvantaged and minority voters as described in Appendix A unless they receive proper notification that their program is not in compliance with one or more provisions of Ohio law. We would expect any such notification to be in the form of a regulation or legally binding advice. Absent such notification, our clients do not intend to desist in the activities described.

This letter addresses only our clients' concerns regarding the transmittal of completed applications. This is based on our understanding that as required by federal law, no Ohio election official will refuse to accept an application tendered by our clients. For this reason, we have shared this letter with the Board of Elections in counties in which our

May 6, 2006
Hon. J. Kenneth Blackwell
Ohio Attorney General Jim Petro
Page 4

clients intend to engage in significant registration. If we are mistaken in our assumption and registrations that are allegedly improperly returned may be rejected, we request that you immediately notify us.

It is our hope that you will be able to quickly lay to rest the confusion surrounding this new provision. We look forward to receiving your response and removing any doubt regarding the legality of our voter registration programs. If our clients are notified contrary to our expectation that their voter registration programs do not comply with the new law, our clients reserve the right and you are so notified to pursue whatever legal remedies may be available to them including those available under the National Voter Registration Act of 1993, 42 USC 1973gg, other provisions of Title 42 of the United States Code and the Constitution of the United States.

Very truly yours,

Karl J. Sandstrom
Counsel for Project Vote

Brian Mellor
Election Coordinator for ACORN



Project Vote is the leading technical assistance and direct service provider to the voter engagement and civic participation community. Since its founding in 1982, Project Vote has provided professional training, management, evaluation and technical services on a broad continuum of key issues related to voter engagement and voter participation activities in low-income and minority communities.

# ENSURING INTEGRITY IN VOTER REGISTATION DRIVES

In recent years, voter registration drives by third party organizations have been very successful at registering millions of new voters and broadening the electorate, especially among low-income and minority people. Project Vote and its local partners alone registered 1.15 million voters in 2003-2004.

*"In order to keep the focus on bringing new voters into the political process, drives must emphasize quality control and maintain the integrity of the voter registration system."*

While a democracy's health is dependent on participation by all its citizens, these successful voter registration efforts have prompted a backlash among those who are not interested in bringing more voters into the political process. Exploiting a very small number of instances in which individuals filled out false applications, these opponents of democracy accuse voter registration organizations of perpetuating widespread "voter fraud," and offer as a "solution" the enactment of new and unnecessarily strict laws regulating voter registration and voting itself. It is essential in this climate for community organizations and other "third party" voter registration and voter engagement organizations to run tightly managed voter registration drives. In order to keep the focus on bringing new voters into the political process, drives must emphasize quality control and maintain the integrity of the voter registration system. This policy brief lays out the key elements of achieving this goal.

739 8th Street, SE
Suite 202
Washington, D.C. 20003

2101 South Main Street
Little Rock, AR 72206
1-800-546-8683

*www.projectvote.org*



Ensuring Integrity in Voter Registration Drives
Issues in Election Administration: Policy Brief Number 4
10.25.05



## Why Quality Control Systems are Essential

Voter registration organizations have a responsibility both to the voter and to the registration process to ensure that voter registration applications are filled out completely and accurately. New voters need to be assured that they are registered and elections departments need to be assured that applications from your organization adhere to policy and practice. When these two things occur, new voters are brought into the electorate.

## Defining Voter Registration Fraud

Voter registration fraud occurs when a canvasser fills out false information on a voter registration application in order to avoid doing the hard work of canvassing. Voter registration fraud does not result in any voter's right to vote being taken away, and it is almost without fail an isolated act committed by someone with no intention of attempting to vote using a false registration. It does, however, waste the valuable time of local elections officials who, during elections, are under tremendous pressure to process a high volume of voter registration cards in a very short time with scarce resources and inadequate staffing. Further, accusations of "voter fraud" can be used to disrupt your program and besmirch your organization's reputation. Therefore, you must implement a serious quality control program as you set up your voter registration program.

## A Strong Quality Control Team

Project Vote strongly suggests that voter registration organizations recruit and train a separate team of volunteers or employees to perform quality control checks on the voter registration applications. The Quality Control team should take each batch of cards through two phases of quality control – the initial phase to check that cards are filled out completely and accurately, and a second phase to call a sample of voters and verify the information on the card. However, before cards reach this stage in the quality control process, there must first be a system that allows the managers of the program to know which volunteer or employee gathered which application.

## Setting Up A System To Track Each Card

### Tying Cards To Employees Or Volunteers

The first step in the quality control process is to ensure that applications can be traced back to the volunteer or employee who helped the applicant complete it. All volunteers or employees must initial each application card that they gather in the field. However, some jurisdictions do not allow notations or other changes to be made on a voter registration application, so check with elections officials before instructing staff to initial completed applications. Organizations should also find out whether volunteers are allowed to fill out applications for voters or whether all the handwriting on the card must be that of the applicant's.

### Batch Cover Sheets

The second part of this initial process is for each volunteer or employee to fill out a cover sheet for the applications he or she collected that day. Project Vote refers to these sheets as "Batch Cover Sheets."

The batch cover sheet should have space for, at a minimum, the date, the number of cards in the batch, and the registration worker's name. Additional helpful information could include the name of the field director, the type of site the worker was at that day, total hours worked, total hours that were spent out in field, the number of cards with email addresses, and the number with phone numbers.

Batch cover sheets stay with the voter registration applications at all times as the applications make their way through the quality control process. There should be a space at the bottom of the batch cover sheet for the quality control workers who verify the cards to fill in information once they finish checking the batch.

## Checking Cards and Calling New Voters

Once cards have been processed for tracking, they should go through a two-step process to ensure accuracy and authenticity. In the initial inspection phase, Quality Control workers should conduct a visual check of all the cards for incomplete or fraudulent information. Workers should check that

2



the handwriting is legible, the birthday is complete and that the person is old enough to register. They should also count the number of applications that include phone numbers; if the number is lower than average, they should subject that batch to stricter examination. Quality Control workers should examine the signatures on the applications throughout the batch to make sure that the handwriting is not similar. Both lack of phone numbers and similar signatures are indications of possible fraud by the worker or volunteer.

In the phone verification phase of quality control, workers should call through a random sample of applications in each batch, congratulating the applicants on their decisions to register to vote and verifying that the information on their cards is correct. They should continue to make phone calls until the information on a minimum of 20% of the applications is verified. Often organizations choose to continue calling until they reach a higher percentage of applicants.

After both phases are completed, Quality Control workers should initial each batch cover sheet to indicate that the batch was visually inspected and called. They should also fill in the total number of cards in the batch and the number of applications in the batch that were verified with a telephone call. Workers should fill out a nightly tally sheet that summarizes their verification work, giving the field director or whoever manages the program quick feedback on the overall quality of their team's work. This will enable the manager to spot any volunteers or employees who are turning in incomplete or fraudulent cards immediately.

## Photocopying Registration Applications

Once original cards have been put through the Quality Control process, they should be photocopied, if local laws allow, and then submitted to the appropriate election official. Where state law allows, it is extremely helpful to maintain two well-organized photocopies of all the registrations applications. One photocopy of the cards should be maintained at the organization's local office, organized by batch and with the batch cover sheets attached. This enables the

organization to look up past voter registration applications of any volunteer or employee. If the organization intends to operate a Get-Out-the-Vote program with its new registrants, a second copy of the cards can be sent for data entry to aid in the creation of phone or walk lists. Again, the second set of copies should be maintained in order with their batch cover sheets.

## Emphasizing Quality Control During Training

Trainers should be very clear with volunteers and employees that there will be an emphasis on quality control. When training canvassers, field directors must emphasize the collection of phone numbers and train canvassers to explain to applicants why it is important that phone numbers are filled in. Trainers should be very clear about what constitutes a complete address and what other fields on the application are required in order for the application to be processed.

Every volunteer or employee should be required to read and sign a policy memorandum that explains how the organization defines fraud, what its consequences are, and that the organization will aid the board of elections and law enforcement agencies in investigating and prosecuting any instances of fraud. For example, Project Vote's packet reads, "If fraud is found by us or by the board of elections we will be able to identify that you turned in the card and we will promptly turn your name and contact information over to the board of elections."

It is very important to set up a system with the volunteers or employees that rewards clean cards and sanctions incomplete or unverifiable cards. One can do this by having quality control workers deduct unverifiable or suspect cards from the worker's total each day. Field managers can use the information in their group and one-on-one trainings with canvassers. Feedback from the quality control team helps field managers spot common errors, retrain workers, and identify problem canvassers. A good payment and promotion system takes into account quality, not just volume.

3



Policy Brief Number 4
### Ensuring Integrity in Voter Registration Drives

*www.projectvote.org*

## Completing the Quality Control Process By Appropriate Deadlines

Each batch of cards should go through the quality control process before submission to elections officials. This process must be completed by the deadline, if any, for transmission of completed applications and, of course, by the voter registration deadline for each election. It can be difficult to move applications through the quality control process quickly during a large voter registration drive, so organizations must ensure adequate capacity to effectively implement their quality control system in order to ensure the integrity of the voter registration effort.

## How to Handle Suspected Fraud

If fraud is suspected, the volunteer or employee should be suspended immediately. If the fraud is verified, the employee or volunteer should be dismissed.

Before starting a voter registration drive, each organization should ask local elections officials how to handle an instance of fraud. In many cases, local elections officials want any fraudulent cards turned in to them, in a separate pile from the completed applications, so that they can decide whether to pursue an official investigation. Voter registration organizations should comply with these local procedures, and offer to aid elections officials in any investigations.

## Building A Relationship With The Local Board Of Elections

It is very important for voter registration organizations to initiate a relationship with staff at local boards of elections before the start of their registration drives. The immediate goals in establishing this relationship are to let the staff know that the drive is starting, to let them know what the goals of the drive are, and to learn how to conduct the drive in accordance with local procedures.

Counties in the same state often enforce deputization laws differently, consider different fields on voter registration forms required, and enforce laws regarding ex-felon registration differently. It is each voter registration organization's responsibility to learn those different procedures, as well as the relevant laws, so that staff are aware if an elections official is asking them to do something that is contrary to law.

By building a positive relationship with the local elections officials, voter registration organizations will be better able to deal with any problems if they arise, and the elections officials are more likely to work collaboratively with organizations to help them improve their quality control procedures if necessary. Project Vote suggests that groups require their field managers to check in with elections staff regularly when turning in applications so that the relationship is maintained and the elections staff have the opportunity to offer feedback.

## Turning In Cards Regularly and Promptly

Voter registration organizations should turn in original cards at a minimum once a week during the drive, or more frequently if required by state law, and should turn cards in every day during the last two weeks before the registration deadline. Project Vote suggests that groups use a cover sheet when turning in cards that tallies up all the batches of cards being turned in, and has a space for the elections official to initial and date, verifying that they received the cards. Project Vote refers to these cover sheets as "Submission Sheets". These submission sheets enable supervisors to verify that their organizers are turning in cards in a timely fashion.

## Conclusion

By following the procedures outlined in this issue brief, voter registration organizations will increase the number of accurate and complete voter registration applications they produce and will further their goal of increasing voter participation.

4