**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PROJECT VOTE**, *et al.* | : | **Case No. 1:06 cv 1628** |
| | : | |
| **Plaintiffs,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | **MEMORANDUM AND ORDER** |
| | : | **GRANTING PLAINTIFFS'** |
| **J. KENNETH BLACKWELL**, *et al.* | : | **APPLICATION FOR A** |
| | : | **PRELIMINARY INJUNCTION** |
| **Defendants.** | : | |
| | : | |

Plaintiffs in this action are various civic organizations, and their individual members, who wish

to engage in voter registration activities throughout Ohio and allege that recently enacted amendments

to the Ohio Elections Code infringe upon these activities - including certain implementing regulations

enacted by the Ohio Secretary of State.[1]  Specifically, Plaintiffs challenge the validity of Ohio Revised

Code §§ 3503.14(A), 3503.19(B)(2)(b) and (c), 3503.29(C), and 3599.11(B)(2)(a) and (C)(2).  These

sections were inserted into Chapter 35 of the Ohio Revised Code by what the parties refer to in this

action as House Bill 3.

Defendants are the Ohio Secretary of State J. Kenneth Blackwell ("Defendant Blackwell"), the

---

[1]     The named Plaintiffs are: Project Vote, American Association of People With
Disabilities, Association of Community Organizations For Reform Now
("ACORN"), People For the American Way Foundation, Common Cause,
Community of Faith Assemblies Church, Mary Keith, John R. T. May, and Linda
Scammicca.  Although not originally named in the Complaint, members of the
Ohio General Assembly (minority caucuses), and the Ohio Conference of the
National Association for the Advancement of Colored People ("NAACP") filed a
Motion for Leave to File as *Amicus Curiae* in Support of Plaintiffs' Application
for a Preliminary Injunction and a Motion for Leave to Intervene as Additional
Party Plaintiffs, respectively, both of which were granted without opposition.

Ohio Attorney General Jim Petro ("Defendant Petro"), the Prosecuting Attorney for Cuyahoga County William D. Mason ("Defendant Mason"), and the Prosecuting Attorney for Summit County Sherri Bevan Walsh ("Defendant Walsh")(collectively, "Defendants").  Although it is the Ohio General Assembly that passed the challenged election provisions, and the Governor of Ohio who signed those provisions into law, the defendants are charged with implementing and enforcing the election laws, including the portions of the law imposing criminal sanctions for non-compliance.

On July 6, 2006, Plaintiffs filed an eight-count Complaint alleging that recent amendments to the Ohio Elections Code, by virtue of the enactment of Ohio House Bill 3, severely impact third-party voter registration efforts in Ohio and hinder low-income, minority, and disabled citizens from registering to vote.  Plaintiffs claim the modifications and additions to the Ohio Elections Code, and the implementing regulations enacted by the Ohio Secretary of State, violate their constitutional rights to free speech and association.  They further claim that the amendments violate, and are superceded by, the National Voter Registration Act of 1993 ("the NVRA").

On July 13, 2006, Plaintiffs filed an Application for a Preliminary Injunction (Doc. No. 3), which sought to enjoin Defendants from enforcing any of the challenged provisions of the Ohio Elections Code - including Defendant Blackwell's regulations.  On August 14, 2006, Defendants filed their response, in which they argue for dismissal of Plaintiffs' Complaint on grounds that Plaintiffs have failed to show that the legislation and regulations at issue unduly burden any protected First Amendment rights.  They further asked that the Court deny Plaintiffs' request for a preliminary

2

injunction for primarily the same reasons.[2]

The Court met with the parties on August 17, 2006 for a Case Management Conference.  At the conference, the Court sought clarification from the parties regarding the need for expedited discovery and/or an evidentiary hearing with respect to Plaintiffs' request for interim relief.  At the parties' request, the Court set up time tables for the submission of further briefing, affidavits, and exhibits in support of the parties' respective positions.  A Preliminary Injunction Hearing was then scheduled for September 1, 2006.

Plaintiffs filed their Reply on August 24, 2006, essentially restating the position asserted in both their Complaint and their Application for a Preliminary Injunction.  All parties filed substantial evidentiary materials in support of their positions shortly thereafter.

On September 1, 2006, the parties convened for the previously-scheduled hearing.  The parties presented oral arguments explaining their views of Plaintiffs' claims and request for injunctive relief, but presented no further evidentiary support for their positions.

Following the hearing, and after review of the evidentiary and written submissions by the parties, the Court orally entered a preliminary injunction in favor of Plaintiffs and against Defendants. While the Court gave a detailed explanation for its ruling from the bench, it promised that a written

---

[2]    To be clear, all Defendants <u>with the exception</u> of Defendant Mason filed a "Motion to Dismiss the Plaintiffs' Complaint and Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction."  Defendant Mason did not join in this Motion and, instead, filed a separate Response.  The response did not take a position with respect to Plaintiff's application for a preliminary injunction, but, rather, requested that *if* such relief was granted, the Court only strike those portions of the voter registration form that are challenged by the Plaintiffs (i.e., Line 15) and allow the remainder of the form to be utilized by state officials so as not to delay or interfere with the process of voter registration so close to an upcoming election.

3

Order would follow.

This Order confirms the Court's earlier entry of a Preliminary Injunction in this matter.  For the reasons outlined on the record and summarized below, the Court **FINDS** that it is appropriate to enter a **PRELIMINARY INJUNCTION** in this case.[3]  Accordingly, Plaintiffs' Application for a Preliminary Injunction (Doc. No. 3) is **GRANTED**.

## I.  BACKGROUND

Amended Substitute House Bill No. 3 of the 126th General Assembly of the Ohio legislature ("H.B.3") made numerous modifications and additions to the Ohio Elections Code (Title XXXV of the Ohio Revised Code), including changes to election-related statutes in Ohio that implicate voter registration activities.  H.B.3 was signed into law by the Governor on January 31, 2006, and most of the provisions became effective on May 2, 2006.  In essence, H.B.3 was - in the words of counsel for Defendants - a comprehensive, top-to-bottom reform of the Ohio Elections Code that "attempts to reorganize Ohio law to bring it into compliance with the federal Help America Vote Act."  Among other things, H.B.3 imposed a variety of restrictions and obligations on non-governmental entities who assist others in the voter registration process.

On May 1, 2006, Defendant Blackwell issued emergency and draft regulations seeking to implement H.B.3.  The regulations became final and effective on July 14, 2006.  Plaintiffs challenge only those portions of the amendments to the Ohio Elections Code, and Defendant Blackwell's regulations, which are relevant to their voter registration activities.  Those provisions are discussed at

---

[3]     This Memorandum and Order is to be read in conjunction with the Court's September 1, 2006 oral pronouncements, which are part of the record.  Together they constitute the Court's ruling on Plaintiffs' Application for a Preliminary Injunction.

greater length further in this Opinion.

Without diminishing the uniqueness of the various activities of each of the Plaintiffs, many of their voter registration activities are similar.  Plaintiffs essentially encourage Ohio citizens to register to vote - and to get out and vote - through various face-to-face interactions across the state.  These interactions typically occur at community events, religious services, workplaces, schools, malls and other places where citizens congregate.  Such activities have commonly become known as "voter registration drives."  In addition, individuals participating in these voter registration efforts sometimes go door-to-door to register voters in residential communities, speaking with residents on their front porches or inside their homes.

As explained at the September 1, 2006 hearing, individuals participating in voter registration drives at the behest of Plaintiffs fall into three general categories: (1) those who are employed by Plaintiffs on a full-time or regular part-time basis whose duties include, but are not limited to, voter registration activities; (2) those who are retained by Plaintiffs for the specific purpose of participating in voter registration drives but whose employment is ad-hoc or irregular, depending on the needs of the plaintiff organization and the anticipated size of the pool of potential registrants; and, (3) those who volunteer their time for the plaintiff organizations, often out of a specific desire to enhance the voter registration process, and who receive no remuneration for their efforts.

Prior to the enactment of H.B.3, Plaintiffs could recruit or assign these individuals to voter registration drives on an as-needed basis, even on short notice, providing them with training or oversight - again - on an as-needed basis depending on their level of experience and/or the level of supervision available at a particular registration site.  Plaintiffs assert that H.B.3 greatly complicates and, in some cases, shuts down this process by requiring pre-registration and online training through

5

the Secretary of State's Office of all would-be "compensated" participants, as well as the filing of a sworn affirmation confirming that such pre-registration and training were completed before any assistance in the voter registration process has been provided to any other person.  Participating in the process without satisfying these pre-registration, training and affirmation requirements subjects all such "compensated" individuals to criminal sanctions.

Also prior to the enactment of H.B.3, individuals (both paid and unpaid) working with various civic groups and/or churches to register voters through these local registration drives were able to turn in completed voter registration forms to the civic groups and/or churches for which they worked. Trained personnel working for these groups would then review the forms for accuracy, turn them into a registrar's office, and follow up later to make sure the voter was actually registered.

Historically, the primary focus of voter registration drives has been low- and moderate-income, minority, and other disenfranchised communities, as well as the disabled.  The changes to the Elections Code, however, Plaintiffs' claim, now forbid voter registration workers from assisting these communities by collecting voter registration forms and turning them into the civic groups and/or churches for which they work.  This is because voter registration workers are now subject to felony charges if the forms are not timely returned to an appropriate State agency (i.e., within ten (10) days of being collected), or if they are not personally returned to the appropriate State agency by the individual voter registration worker.

Finally, prior to H.B.3, voters could register after properly filling out a voter registration card and verifying the information with their own dated signature.  By virtue of H.B.3, however, and Defendant Blackwell's implementation thereof, voter registration forms now require a voter to disclose the identity and employer of any "compensated" person (and, it appears, possibly every

"compensated"person) who aided them at any stage in the process - including by providing them with a form, helping them understand it, or collecting it from them.[4]  Again, failure to provide the information mandated by the voter registration form carries the consequence of possible criminal sanctions.

Plaintiffs allege they have stopped their voter registration activities out of fear of criminal prosecution, both for their organizations and for all individuals who would aid them in their voter registration efforts.  They argue the regulations are vague and overly broad, and infringe upon their First Amendment right to free speech and association.  Plaintiffs also claim that H.B.3, and the implementing regulations, are inconsistent with the goals of the National Voter Registration Act of 1993 ("NVRA").  Plaintiffs argue courts have recognized that the NVRA "impliedly encourages" voter registration drives like those undertaken by Plaintiffs, and that the NVRA was expressly enacted to "increase the number of eligible voters to register to vote in elections for Federal office."

In support of the legislation and regulations being challenged by Plaintiffs, the government articulates several State interests which it claims these provisions further.  These interests include: (1) ensuring that voter registration forms are timely and correctly submitted; (2) insuring against the submission of fraudulent voter registration cards; (3) allowing for prosecution of those who would submit fraudulent voter registration cards; and, (4) to a lesser extent, relieving administrative burdens on registrars and on those who participate from the governmental side in the registration process.

---

[4]    While H.B.3 - specifically, O.R.C. § 3503.14(A) - does not appear to limit these mandatory disclosure obligations to only "compensated" individuals, the form prepared by the Secretary of State's office makes this distinction.

## II.    ANALYSIS

A preliminary injunction is a provisional remedy authorized under Fed. R. Civ. P. 65.  It is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 at 129-30 (2d ed. 1995).  In exercising its discretion to enter a preliminary injunction order, this Court must consider four factors:

(1)    whether Plaintiffs have a reasonable likelihood of success on the merits;

(2)    whether Plaintiffs likely will suffer irreparable harm if the alleged conduct continues;

(3)    the balance of hardships on the parties; and

(4)    the impact of the injunction on the public interest.

*Oakley Inc. v. Sunglass Hut, Int'l,* 316 F.3d 1331, 1338-39 (Fed. Cir. 2003); *see also Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997).

"It is important to recognize that the four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied.  These factors simply guide the discretion of the court;  they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Industries, Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).  Thus, "the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  "In general,  the likelihood of success that need be shown (for a preliminary injunction) will vary inversely with the degree of injury the plaintiff will suffer absent an injunction." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)(internal citation omitted).

After reviewing all of the briefs submitted by the various parties, and following careful consideration of the relevant case law, the Court is satisfied that participation in voter registration

8

implicates a number of both expressive and associational rights which are protected by the First Amendment.  These rights belong to - and may be invoked by - not just the voters seeking to register, but by third parties who encourage participation in the political process through increasing voter registration rolls.  *See, e.g., Williams v. Rhodes*, 393 U.S. 23, 30 (1968)(Court must guard against impingement on different, though overlapping kinds of rights - "the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.").[5]

Because of this, a determination of whether a preliminary injunction is appropriate in this case necessarily involves a discussion and determination of the proper level of scrutiny to be applied to this constitutional challenge.  This is because, under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), this Court must determine the character and magnitude of the asserted constitutional injury and then weigh that against the State's articulated justifications for the burdens causing  that injury.  *Id.* at 789.  If the burden on constitutional rights is severe, the Court must employ strict scrutiny.  If the burden is less substantial, the inquiry may be more relaxed.  *Id.*

---

[5]     While the Court cited additional case law in support of this conclusion in its bench opinion, the Court reserves a full discussion of the legal underpinnings of this conclusion for its upcoming ruling on Defendants' pending Motion to Dismiss.  That Motion is squarely premised on Defendants' contention that Plaintiffs have failed to articulate any First Amendment interest in pursuing registration activities designed to register third-parties to vote in the State of Ohio. While the Court has little trouble rejecting that contention after its thorough review of relevant case law, in the interest of expediting this Order, the Court reserves that part of its analysis for the later ruling.  The Court notes, however, that Defendant Mason - who did not join in the Motion to Dismiss filed by the remaining Defendants - clarified on the record at oral argument that it is the position of his office that First Amendment interests are implicated by Plaintiffs' voter registration activities.  Neither the plaintiffs or Defendant Mason, however, have clearly defined the scope and breadth of the claimed protected interests.

Briefly, under strict scrutiny the government must assert a significant and compelling governmental interest, and the Court must decide whether or not the legislation is sufficiently narrowly tailored to serve that interest. *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37 (1983). Under intermediate scrutiny, the government need only articulate an important or substantial governmental interest, and the Court must determine if the means chosen to enforce that interest is no greater than is essential to the furtherance of that interest. *United States v. O'Brien*, 391 U.S. 367 (1968). Finally, under rational basis review, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

The Court has been given a limited time frame in which to determine the proper level of constitutional scrutiny to be applied to a challenge to the legislative regulation of voter registration activities, and the parties have spent little time in their briefs on this issue. Based on its limited review, the Court is inclined to believe that the appropriate level of scrutiny to be applied at this juncture of the proceedings is intermediate scrutiny. The Court reaches this conclusion because it finds that, while the interests impacted by the regulations are critical First Amendment rights, the burden imposed upon them by the regulations - though substantial (and, as will be discussed below, unnecessary) - are not likely properly characterized as "severe." Thus, the question is whether the burdens imposed by the challenged regulations are justified in light of the articulated interests - specifically, do the regulations address a legitimate and important state interest, and do the regulations serve that interest in a way that is no greater than necessary in light of the importance of the interest.

With these considerations in mind, the Court turns to a brief analysis of the factors considered in deciding whether to grant a preliminary injunction, the nature of the burdens imposed on Plaintiffs,

10

and the State's interests in enforcing the challenged provisions.

**A.     Are Plaintiffs Likely To Succeed On The Merits?**

The parties in this case have focused primarily on the question of likelihood of success on the merits.  That is because, in this case, the issue of likelihood of success on the merits has subsumed within it the other relevant factors.  In other words, if the Court concludes that the regulations challenged by Plaintiffs unduly impinge upon constitutionally protected rights, the Court also can easily conclude that the public interest is served by an injunction prohibiting such impingement.  Similarly, if the Court concludes that the challenged regulations fail to further any legitimate state interest, or are not sufficiently narrowly tailored in their effort to do so, the Court also can easily conclude that the balance of hardships tips in favor of the injunction Plaintiffs seek.  The focus of this Order, therefore, also will be on Plaintiffs' likelihood of success on the merits.

For purposes of this case, the Court is concerned with the following restrictions on voter registration activities that have been imposed by virtue of the amendments to the Elections Code:

    1.    The requirement that those who are *compensated* for registering a voter must: (a) pre-register with the Secretary of State before conducting any voter registration activities; (b) participate in an "online-only," web-based training program; and, (3) sign an affirmation each time they submit voter registration forms that identifies the worker, and attests that the worker has completed the training program and has complied with all laws governing voter registration activities (the "Pre-registration, Training and Affirmation Requirements of O.R.C. § 3503.29").

    2.    The requirement that anyone who registers another person to vote in Ohio must personally return a voter registration card given to them - either by placing it in the mail themselves, or delivering it in person to the Secretary of State or an Ohio elections office (the "Direct Return Requirement under O.R.C. § 3503.19

11

and § 3599.11").[6]

3.    The requirement that those who are *compensated* for registering a voter must identify their name, address and name of the organization employing the worker on Line 15 of Ohio's Voter Registration Form (the "Compelled Disclosure Requirement of O.R.C. § 3503.14").[7]

    1.    <u>The Pre-Registration, Training and Affirmation Requirements of O.R.C. § 3503.29</u>

The Court finds that requiring those voter registration workers who are *compensated*, and only those who are compensated, to pre-register with the Secretary of State, undergo an "online-only" Internet training program, and submit an affirmation for each batch of voter registration forms returned is - on its face - not a uniform and non-discriminatory attempt to protect the integrity of the electoral process.

The NVRA requires that "any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office ... shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." *See* 42 U.S.C. § 1973gg-6(b)(1).  The House Report for the NVRA cautions that "the Committee believes Congress should assist in reducing barriers, particularly Government-imposed barriers to applying for registration wherever possible."

---

[6]    As drafted and passed, it is arguable that this provision required personal delivery of voter registration forms.  Such a requirement would clearly run afoul of the NVRA.  *See Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005)("By requiring the states to accept mail-in forms, the Act does regulate the method of delivery, and by doing so overrides state laws inconsistent with its mandates.").  The Secretary of State has mooted a challenge on these grounds, however, by interpreting the law to allow for a "direct return" by mail.

[7]    As noted above, the law itself does not appear to limit its disclosure obligations to only compensated individuals.  Because the Secretary of State has implemented the law in that fashion, however, the Court will analyze it accordingly.

Far from doing that, the pre-registration, training, and affirmation requirements imposed by Ohio law goes against the very spirit of the NVRA by erecting barriers - only for a *selected class* of persons - that previously did not exist.  These provisions are neither uniform nor non-discriminatory in that: (1) they do not apply to everyone involved in the process; (2) they require training only on the Internet; and, (3) they necessarily exclude participation by those who do not have access to, or the financial wherewithal to have access to, not only the Internet, but the ability to use the Internet.

Defendants were unable to point to any other state that has enacted anything remotely similar to the burdens Ohio has placed upon *compensated* voter registration workers.  This fact illustrates the harshness of these requirements.  There is no question that such unique burdens have a chilling effect on a variety of voter registration efforts - most significantly voter registration drives - the very efforts the NVRA sought to expand rather than constrict.

Defendants also failed to show how the State's articulated interests, outlined above, are served by these restrictions.  There was no evidence presented to indicate how *compensated* workers, in contrast to their volunteer counterparts, would be more in need of state-mandated voter registration training.  In contrast, Plaintiffs presented testimony that they routinely undertake training of their workers, regardless of the status of the worker (i.e., compensated or non-compensated).

Based on the record before the Court, there simply is no reason to assume that compensated workers would be more "ill equipped" to assist in filling out the registration forms than uncompensated voter registration workers.  Indeed, logic compels the opposite conclusion - those employed for the precise purpose of helping to increase voter registration and, ultimately, voter turnout, likely would exercise greater care in learning about and effectuating the process.  In fact, there is nothing difficult or complex about the voter registration process that even indicates training would be necessary for

*anybody* who would participate in a voter registration drive.  The forms are self-explanatory, and as long as someone is sufficiently educated to read and write, it appears they could at least assist someone else in filling out such a form.

The regulations also have the discriminatory effect of imposing an undue burden primarily on poor and/or elderly voter registration workers - without regard to how de minimus their alleged "compensation" may be.  It is arguable the training discriminates against the elderly to the extent they may be less adept at use of the Internet, and less comfortable with the use of the computer process. Similarly, it is likely that low-income voter registration workers would have less access to a computer - either because of financial restraints that prevent them from owning a computer, or from lack of access to transportation to get to a location that has a computer.

For all of these reasons, the Court finds that these pre-registration, training and affirmation requirements of O.R.C. §3503.29 are in conflict with and, thus, preempted by the NVRA. *See Charles H. Wesley Educ. Foundation, Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) (NVRA overrides all state laws which are inconsistent with its specific mandates).[8]

Notwithstanding the NVRA, moreover, these regulations are separately problematic from a constitutional standpoint.  The regulations require that only a *selected class* of individuals undergo a cumbersome and unnecessary training process, as discussed previously.  There appears to be no rational

---

[8]      Plaintiffs have asserted that <u>all</u> of the challenged provisions of H.B.3 are preempted by the NVRA because each provision impedes third-party voter registration drives in some way. The Court does not believe the breadth of the NVRA's preemptive effect goes as far as Plaintiffs contend - i.e., the Court does not believe the NVRA has so preempted the field as to invalidate all efforts to restrict third-party voter registration drives. The Court merely finds that the pre-registration, training, and affirmation requirements place an undue burden on third parties trying to conduct voter registration drives, and are inconsistent with and undermine both the text and purpose of the NVRA.

basis for the differentiation between compensated and uncompensated voter registration workers for purposes of pre-registration, training, and affirmation.  Additionally, the restrictions pose extreme complications because the legislation does not clearly define what it meant by "compensated" individuals.  The examples posed by the Court during oral arguments illustrate how difficult it is to understand what is meant by "compensation" in this context.  Thus, it is unclear whether full-time workers with other duties are "compensated" when they are diverted from their regular duties to help with voter registration drives.  Similarly, it is unclear whether a "volunteer" whose expenses are paid or meals supplied would be a "compensated" individual under the act potentially subject to criminal sanctions for failure to register and train before their volunteer activities.

The State contends that these mandates are necessary, even if somewhat cumbersome, because they help guard against voter fraud.  The State asserts that "compensated" workers simply are more likely to engage in voter fraud than non-compensated workers.  In support of this contention, the State proffered affidavits from official registrars who say they "perceive" or believe this fact to be true.  In addition, the  Defendants submitted evidence that between 19 and  30 voter registration cards were fraudulently submitted by a "compensated" individual in Hamilton County, Ohio in 2004.   Given the small percentage of voter registration cards this represents, however, it is difficult for the Court to extrapolate from this evidence the conclusion that compensated voter registration workers are more prone to fraud.  The same is true to a reference in an affidavit submitted by Defendants indicating that approximately 2,000 voter registration cards were turned over to the Summit County prosecutor's office for a fraud investigation.   It is not clear from the affidavit whether those cards were returned by compensated voter registration workers as opposed to unpaid volunteers, however, and there is no indication that a finding of fraudulent activity was ever made.

The fact that election workers with whom defense counsel spoke might generally *assume* that compensated voter registration workers are more prone to fraud than volunteers is insufficient as a matter of law to justify legislation that imposes substantial burdens on the First Amendment rights of those compensated workers and the entities with whom they are affiliated.  For all of these reasons, Defendants are preliminarily enjoined from requiring pre-registration, training, and affirmations from compensated voter registration workers.[9]

>        2.        The Direct Return Requirement under O.R.C. § 3503.19 and § 3599.11

The Court easily finds that this provision fails under any standard of review, as it severely chills participation in the voter registration process.  The fact that, once again, it is unique to Ohio highlights the hesitancy most states employ when treading in this area.[10]

The burden on the voter registration process is extreme under a direct return provision, even where Defendants allow for the "direct return" of voter registration forms by mail.  Anyone who reasonably tries to help someone register to vote could run afoul of this provision, which carries potential felony criminal charges and penalties.  Because there are no exceptions to the personal return requirement, the prospect of being labeled a felon for mere inadvertence, confusion, or innocent mistake

---

[9]        It is assumed that Defendants would not attempt to impose similar restrictions on *unpaid* voter registration workers since, from the face of the statute, no such restrictions are in existence.  While the Court does not here address the validity of a regulation that would impose training and registration requirements on <u>all</u> voter registration workers, it is highly unlikely - for many of the reasons already noted - that the burdens imposed by such a requirement ever could be justified.

[10]        Again, Defendants were unable to point the Court to any other state that requires a third party who receives a voter registration card to *personally* return that voter registration card by mail or directly to a state agency - rather than to a voter registration organization - where the applicant chooses to turn possession of the card over to the third party.  The Court likewise was unable to find any other jurisdiction with such a requirement.

weighs heavily upon anyone - be it a family member who encourages participation in the political process and receives a voter registration form from another family member, an administrative assistant who is asked by his or her superior to handle the return of a voter registration form, or a volunteer "candy striper" at a senior citizen center who turns over a registration card received from an elderly patient to his or her supervisor because of uncertainty in the procedures for handling patient mail.

The Court's conclusion that this provision chills volunteer participation in voter registration efforts is based not only upon the materials submitted by the parties and defense counsel's responses to various examples posed by the Court at oral argument, but also upon the affidavits of individual plaintiffs who have attested to the fact that they have indeed stopped participating in voter registration drives out of fear of criminal prosecution for failure to personally place a voter registration card received by them in the mail or in the hands of an appropriate agency.  Indeed, it is logical to conclude that anyone would be chilled in these circumstances.

Although the State has articulated certain legitimate interests when considered in the abstract, the Court fails to find that the direct return provision serves any of them.  A brief examination of the articulated interests makes this clear.  Plaintiffs are not challenging the 10-day requirement for the return of voter registration forms which is also mandated by H.B.3.  Timeliness, therefore, whatever its merits, is not an issue.  And, while protecting against voter fraud is a valid interest, this provision does nothing to further that interest.  In fact, this provision actually *removes* a level of scrutiny and care which might prevent fraud.  Thus, if a person were inclined to submit a card that purports to register "Mickey Mouse," it seems they would be *less* likely to do so if they were submitting the form to somebody else for review before it was returned to an anonymous state employee.  As to the State's administrative concerns, it is arguable that this provision imposes greater administrative burdens - not

17

less - on registrars, since they would have mass numbers of individual mailings to process, rather than a limited number of bulk mailings that had been pre-screened before being mailed.

In sum, the Court finds that the direct return provision - except for the unchallenged 10-day return requirement - imposes an extreme burden on the First Amendment rights of those who participate in voter registration drives without serving any legitimate state purpose.

### 3. The Compelled Disclosure Requirement of O.R.C. § 3503.14

Defendants assert that it is fear of voter registration fraud which is the primary concern prompting the requirement on Line 15 of the Voter Registration Form that *compensated* voter registration workers disclose their name, address, and the name of the organization employing them (under threat of criminal penalty for election falsification).  In support of this, Defendants point to the affidavit previously mentioned in this Opinion that cites to some 19-30 bogus voter registration cards which were submitted by a worker previously affiliated with one of the Plaintiffs.  The Court, however, finds the affidavit to be insufficient to sustain Defendants' burden to show that an important state interest is served by the compelled disclosure regulation in a way that is "no greater than necessary."

It is clear that the compelled disclosure of an organization employing a compensated voter registration worker has a direct impact on the associational rights of the plaintiffs and the affected compensated worker.  *See, e.g., NAACP v. Alabama*, 357 U.S. 449 (1958).

The interactive nature of voter registration drives is obvious:  they convey the message that participation in the political process through voting is important to a democratic society.  These interactions likely often contain a more partisan message as well - that participation in the voting process in support of a particular candidate or ideal is encouraged.  The right to engage in these interactions and to do so with some measure of anonymity is clear protected by the First Amendment.

18

Cf., *California Democratic Party  v. Jones*, 530 U.S. 567, 574 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views").

While it is less clear whether the compelled disclosure of a compensated voter registration worker's name and address would pose a similar burden on the First Amendment rights of such workers, the Court need not reach that question at this stage.  Given the current format of voter registration cards being used by the Secretary of State, the Court cannot allow continued use of Line 15 of Ohio's voter registration form, or authorize criminal prosecutions for failure to provide the information required.  Having examined the voter registration form used in the State of Ohio, not only does it require the name, address, and employer of the person participating in the registration, but it refers only to *compensated* individuals - a fact which appears to be inconsistent with the legislation itself.  As noted above, the legislation does not differentiate between compensated and uncompensated workers for purposes of the compelled disclosure requirements the Secretary of State has purported to implement by use of Line 15.  In addition, the registration form refers to three different people.   It essentially requires the signature of anyone who (1) provided the form, (2) aided in filling out the form, or (3) received the form.  Under certain scenarios that were discussed during the September 1, 2006 hearing, the signatures of three different people would be required in order for Line 15 of Ohio's Voter Registration Form to be adequately filled out.  The burdens imposed on the voter registration process by this cumbersome requirement are extreme.

Again, the Court reiterates that the NVRA requires that "any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office ... shall be uniform, nondiscriminatory, and in

19

compliance with the Voting Rights Act of 1965."  *See* 42 U.S.C. § 1973gg-6(b)(1).  The compelled disclosure requirement is neither uniform nor non-discriminatory, because it does not apply to everyone involved in the process.  It only applies to those receiving "compensation" - whatever that may be classified as - regardless of how de minimus that compensation.

More importantly, Defendants evidence again fails to connect the disclosure requirement with the prevention of fraud.  It is difficult to imagine that a compensated voter registration worker would sign their correct name, address, and employer after fraudulently identifying "Mickey Mouse" (or some other bogus registrant) as the voter being registered.  This rule offers no real help in determining the actual identity of an individual voter registration worker responsible for fraud.

The provision itself is illogical, moreover.  Those people who are passionate enough to take time away from their daily activities and undertake efforts to ensure that those who can vote do vote, are underline less likely to commit fraud.  It simply is not logical to assume that those whose purpose and function it is to make sure that as many individuals as possible get registered to vote so that they can legitimately do so, would be more inclined to submit improper or fraudulent voter registration cards.

Because this provision compels - under threat of election falsification and threat of prosecution - compensated voter registration workers to disclose information about their identity and their association with various organizations, without actually serving any of the State's legitimate interests, the Court is compelled to bar enforcement of this provision at this juncture of the proceedings.

**B.    Will Plaintiffs Suffer Irreparable Injury Absent The Injunction?**

Plaintiffs have presented sufficient evidence to support their claim that they will suffer irreparable injury in the absence of an injunction.  Affidavits were submitted by Plaintiffs showing a clearly articulated fear on the part of individual registration workers - whether compensated or

volunteers - of being charged with felony criminal charges as a result of what the Court finds to be confusing, burdensome, and discriminatory regulations.  But for the issuance of an injunction, Plaintiffs will continue to be dissuaded from engaging in an important political activity, and will no longer enjoy the freedom they once had to enthusiastically register Ohio citizens to vote, and to encourage participation in the political process.

### C.    Will An Injunction Cause Substantial Harm To Others?

Defendants have failed to show how preventing enforcement of the regulations at this juncture of the proceedings would cause harm to them or to the citizens of Ohio.  As discussed above, Defendants have failed to explain how the challenged provisions of H.B.3 will aid or enhance the electoral process in Ohio.  The Court notes, moreover, that there are <u>multiple</u> provisions in the Ohio Elections Code already designed to prevent and penalize those who would engage in election fraud, and none of those provisions have been challenged here.  The issuance of this preliminary injunction will have no meaningful effect on Defendants' ability to investigate and prosecute those who attempt to fraudulently register a person to vote.[11]

### D.    Will The Public Interest Be Served By The Issuance Of The Injunction?

As mentioned earlier in this Opinion, this prong is essentially subsumed within an analysis of Plaintiffs' likelihood of success on the merits.  The Court, however, separately finds that the public

---

[11]    For instance, O.R.C. §3505.18 requires that voters show ID before voting; O.R.C. §3599.11(A) provides that "[n]o person shall knowingly ... aid or abet any person to [register in a precinct in which the person is not a qualified voter]," or "knowingly induce any person to [register under more than one name]," or "knowingly make any false statement on any form for registration;" and, O.R.C. §3599.11(B)(1) provides that "[n]o person who helps another person register outside an official voter registration place shall knowingly destroy ... any completed registration form."

21

interest is best served by ensuring that the Ohio electoral process recognizes, upholds, and stays true to the avowed *national* interests embodied within the National Voter Registration Act of 1993. As explained in the House Report for that Act, "the enactment of the Voting Rights Act of 1965 eliminated the more obvious impediments to registration but left a complicated maze of local laws and procedures, in some cases as restrictive as the outlawed practices through which eligible citizens had to navigate in order to exercise their right to vote ... the unfinished business of registration reform is to reduce those obstacles to voting to the absolute minimum, while maintaining the integrity of the electoral process."

Under the Act, it is the government's duty to <u>promote</u> the exercise of the fundamental constitutional right of citizens to vote. Because the restrictions on voter registration activities outlined above, viewed separately or in combination, do not promote the exercise of the right to vote but, rather, chill the exercise of that right through an unusual and burdensome maze of laws and *penalties* relating to a major step in the voting process - registration - the public interest can only be protected through elimination of these barriers. The integrity of the electoral process in Ohio will continue to be maintained following issuance of this Order by leaving intact - as unchallenged - the previously mentioned provisions of Ohio law which allow the government to investigate and prosecute suspected voter fraud.

III.   **CONCLUSION**

For all of the foregoing reasons, the Court finds that entry of an injunction in this case is appropriate.   Accordingly, Plaintiffs' Application for a Preliminary Injunction (Doc. No. 3) is **GRANTED**.

Pending further Order of this Court, Defendants, as well as their officers, agents, servants, employees, attorneys and all those in active concert and participation with them, are hereby **PRELIMINARILY ENJOINED** and no state or law enforcement official may enforce, seek to enforce, threaten to enforce, or otherwise invoke with an expressed intention to enforce: (1) the Pre-registration, Training and Affirmation Requirements of O.R.C. § 3503.29; (2) the Direct Return Requirement under O.R.C. § 3503.19 and § 3599.11; and, (3) the Compelled Disclosure Requirement of O.R.C. § 3503.14, including the threat of criminal prosecutions for the failure to undertake any of the acts required by these provisions.

Furthermore, the Court issues the following instructions:

All Defendants **ARE INSTRUCTED** to permit use of the current Voter Registration Form until such time as a new Voter Registration Form can be issued without the compelled disclosure requirement of Line 15;

Defendant Blackwell **IS INSTRUCTED** that his office may not refuse to accept any voter registration form on grounds of noncompliance with any of the above-mentioned provisions, and is further instructed to accept and process any otherwise properly completed Voter Registration Form without reference to whether it contains the information requested on Line 15;

Defendant Blackwell **IS INSTRUCTED** to amend his Website within five (5) days from September 1, 2006 to remove any reference to obligations imposed by the above-mentioned provisions

23

and remove any reference to the threat of criminal prosecutions for the failure to undertake any of the acts required by the above-mentioned provisions.

In accordance with Fed. R. Civ. P. 65(d), all Defendants **ARE INSTRUCTED** to provide actual notice of this Order to their officers, agents, servants, employees, attorneys and all those in active concert and participation with them, so as to assure compliance.

For the reasons explained at the September 1, 2006 hearing, bond is **SET** at $0.00.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 8, 2006**